## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**LARRY CLEMENT,**

    **Petitioner,**

**v.**                                                    **Case No.: 2:15-cv-02320**

**DONALD F. AMES, Superintendent,**
**Mount Olive Correctional Complex,**

    **Respondent.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

Pending before the Court are Petitioner's Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, as Amended (ECF Nos. 2, 20), and Respondent's Motion for Summary Judgment, (ECF No. 25). This case is assigned to the Honorable Thomas E. Johnston, United States District Judge, and by standing order is referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

After thorough consideration of the record, the undersigned conclusively **FINDS** that (1) there are no genuine issues of material fact and (2) Clement is not entitled to the relief requested. Therefore, for the reasons that follow, the undersigned respectfully **RECOMMENDS** that the presiding district judge **GRANT** Respondent's Motion for Summary Judgment, (ECF No. 25); **DENY** Petitioner's Petition for a Writ of Habeas Corpus as Amended, (ECF Nos. 2, 20); and **DISMISS** and **REMOVE** this case from the docket of the court.

# I.    Procedural History

## A. Indictment, Trial, and Direct Appeal

In May 2007, Petitioner, Larry Clement ("Clement"), was indicted by a Fayette County grand jury on thirty-two counts of first-degree sexual abuse, sixteen counts of first-degree sexual assault, thirty-two counts of sexual abuse by a parent, guardian, or custodian, and sixteen counts of second-degree sexual assault. (ECF No. 9-1 at 3). The indictment alleged that Clement had sexually abused two minors, A.C.H. and A.S.H., over a period of sixteen months from September 2005 to December 2006. (*Id.* at 4). The alleged victims were the granddaughters of the woman with whom Clement cohabitated for many years. (ECF No. 9-2 at 52).

Clement's trial began on January 28, 2008, in the Circuit Court of Fayette County, West Virginia ("Circuit Court"). (ECF No. 24-29 at 2). During *voir dire* proceedings, the prospective jurors were asked whether they knew either of the State's prosecuting attorneys, Carl Harris and Jennifer Hewitt, personally or through business relationships. One prospective juror, Marjorie Marsh, indicated that she had previously been represented by Mr. Harris in a real estate transaction. (*Id.* at 14-15). Ms. March asserted that this prior interaction with Mr. Harris would not affect her ability to judge the case fairly. (*Id.* at 15).

The Circuit Court advised the prospective jurors that the criminal case alleged crimes involving sexual assault and abuse and inquired if any of the prospective jurors had ever been victims of sexual abuse, or been close to a victim of sexual abuse. (*Id.* at 39). Several prospective jurors responded in the affirmative and were questioned privately *in camera* regarding whether they believed their experience with sexual abuse would impact their ability to fairly judge the case. (*Id.* at 39-53). A number of the

prospective jurors questioned stated they would be unable to remain neutral based on their past experience with sexual assault and were accordingly excused for cause. (ECF No. 24-29 at 46-52).

At a later point in the *voir dire* proceedings, Mr. Harris inquired of the prospective jurors whether they watched shows such as "CSI, NCIS, or any of those other acronyms," and whether they believed that "there has to be some sort of physical evidence in a case before you can convict someone of a crime?" (*Id.* at 69). Mr. Harris further stated that:

> Sometimes all you have in a case is the testimony of witnesses, because there's no physical evidence. In this case, although it's a sexual assault and sexual abuse case, it doesn't involve sexual intercourse with anyone. It involves touching someone, accusations of placing a finger inside of the young lady's vagina, where there would not be any physical evidence.

(*Id.* at 69-70).

Following the conclusion of *voir dire* proceedings, Mr. Harris outlined the State's case in his opening statement, explaining to the jury how the evidence would show that from September 2005 through December 2006, Clement sexually abused two minors, A.C.H. and A.S.H., who were the grandchildren of Clement's long-term girlfriend. (*Id.* at 97-99). In response, Clement's attorney, Charles Mullins ("Mullins"), told the jury in his opening statement that the evidence would establish that Joe Howell ("Howell"), a state trooper and the father of the alleged victims, orchestrated the charges against Clement in retaliation for his support of the victims' mother during her divorce proceedings against Howell. (*Id.* at 102-04).

The State's first witness was A.S.H., who was 16 years old at the time of the trial. (*Id.* at 112-13). A.S.H. testified that she lived in Oak Hill, West Virginia with her parents and siblings. She had a grandmother, Carolyn Candler, who lived a short distance from her family's home. (ECF No. 24-29 at 114-16). Clement lived with A.S.H.'s grandmother

3

for as long as she could remember. A.S.H. visited her grandmother "about every weekend," and would frequently spend the night. (*Id.* at 116).

A.S.H. testified that Clement "would grab me forcibly into him, and he would go up my shirt, under my bra and grab my breasts, and then he would go down my pants and start rubbing my vagina." (*Id.* at 117). Clement would put the tip of his finger into A.S.H.'s vagina during these assaults. (*Id.*). An assault of this type occurred in September 2005, and Clement continued to sexually abuse A.S.H. at least once a month, until she told her father about the unwanted touching in January 2007. (*Id.* at 117). A.S.H. stated that these assaults normally happened late at night when her grandmother was in other rooms of the house, either in bed or in the computer room located at the back of the house. (*Id.* at 117-18).

When asked if she attempted to stop Clement when he tried to touch her, A.S.H. testified that she did, explaining: "I would put my hand where my pants was and try to push his hand up from going down my pants." (ECF No. 24-29 at 118). Clement ignored these attempts at resistance. (*Id.*). A.S.H. stated that when Clement did these things to her, "he just acted like I was his or something." (*Id.* at 122).

A.S.H. did not tell anyone about these assaults until January 2007, after her little sister, A.C.H., asked her "[h]as he ever touched you?" (*Id.* at 118). When A.S.H. asked her sister what she meant, A.C.H. said "[w]ell, he's been going up my shirt and down my pants." (*Id.*). Following this conversation, A.S.H. believed she should inform her father about what Clement had been doing to her at her grandmother's house. (*Id.*). A.S.H. asserted she had not done so before because she was afraid of Clement. (ECF No. 24-29 at 118). A.S.H. explained that Clement would "always be cussing and hollering and plus he always forced me into him." Further, Clement told her, "if I said anything, bad things

would happen; and he said, if I told my dad, he could fight my dad. And so I just thought it would make matters worse." (*Id.* at 119). Clement once asked A.S.H. if she would like to go somewhere, such as the beach, with him and without her mother and father present. This frightened A.S.H., who became worried Clement might kidnap her. (ECF No. 24-29 at 119).

A.S.H. testified that she felt "very uncomfortable" when Clement did these things to her, and that she became so unhappy "I didn't want to be around anybody. I wanted to die." (*Id.* at 119-20). During the latter half of 2006, when these events were occurring, A.S.H.'s grades began to fail, and she told her mother and father she wished a car would run over her. (*Id.* at 120-21). A.S.H. also began practicing self-harm, which she hid from her parents by wearing large bracelets. (*Id.* at 122-23). A.S.H. made an in-court identification of Clement. (*Id.* at 125).

On cross-examination, Mullins questioned A.S.H. regarding a number of issues; including, the presence of other people in her grandmother's house when the sexual abuse allegedly took place. (*Id.* at 128-35). A.S.H. conceded that her sister and mother were often present during A.S.H's visits with her grandmother, although her grandmother was usually in a back room, or was sleeping. When asked about her clothing, A.S.H. explained that she was of the Apostolic faith, so she wore ankle-length skirts, with leggings underneath. (ECF No. 24-29 at 136-37). Mullins questioned A.S.H. about her parents' relationship, and she testified that there was a period of time when her parents lived apart, although she did not know the details. (*Id.* at 137-38). Mullins inquired if A.S.H. had spoken with anyone prior to trial regarding the content of her anticipated testimony, to which A.S.H. denied having done so. (*Id.* at 125-26). Under re-direct examination, A.S.H. clarified that she had spoken with the prosecutor prior to the trial regarding what Clement

5

had done to her, and the prosecutor had told her that all she had to do at trial was tell the truth. (*Id.* at 138-39).

The State's next witness was Dr. Aditya Sharma. (*Id.* at 142). Dr. Sharma received a medical degree in psychiatry from the University of Virginia Medical School and had been a practicing psychiatrist in West Virginia since 2005. (*Id.* at 142-43). He was recognized as an expert in the field of psychiatry by the Circuit Court. (ECF No. 24-29 at 143-44). Dr. Sharma testified that he began treating A.S.H. and A.C.H. in March 2007. (*Id.* at 144). At that time, A.S.H.'s mother was concerned about A.S.H.'s suicidal tendencies, reporting that A.S.H. was cutting herself, had threatened to jump in front of a car, and had twice taken an overdose of pills. A.S.H. herself admitted to attempting suicide by overdose on at least twelve occasions, which Dr. Sharma found to be particularly concerning. (*Id.* at 144-45). A.S.H. had nightmares that included flashbacks to the sexual molestation she reportedly experienced. (*Id.* at 145). Dr. Sharma believed A.S.H. was suffering from post-traumatic stress disorder ("PTSD") and depression due to sexual abuse. (*Id.* at 146, 149).

With respect to A.C.H., Dr. Sharma testified that A.C.H. also displayed symptoms of PTSD, including hypervigilance, extreme irritability, extreme defiance, anger outbursts, excessive crying, and fear. (*Id.* at 148). A.C.H. did not express thoughts of suicide, but was in a "fairly decompensated state." (*Id.*). Dr. Sharma opined that A.C.H.'s PTSD was also secondary to the alleged sexual abuse by Clement.

On cross-examination, Dr. Sharma agreed that his diagnosis was based solely on information provided to him, and he had not untaken an independent investigation to determine the truth of that information. (*Id.* at 149). Dr. Sharma explained that he was the minors' treating psychiatrist, and in that role, he did not function as a forensic

psychiatrist. (ECF No. 24-29 at 149-51). Dr. Sharma was still treating both children at the time of the trial. (*Id.* at 154-55). Dr. Sharma testified that he had prescribed Klonopin to A.S.H., a drug that, due to its potency, was only rarely prescribed to children and was a "medication of last resort." (*Id.* at 155-56).

The next witness to testify was A.C.H., who was 13 years old at the time of trial. (*Id.* at 162). A.C.H. testified that Clement would touch her breasts when she stayed at her grandmother's house. (*Id.* at 170-71). A.C.H. agreed that during the time period between September 2005 and January 2007, she would stay at her grandmother's house "a few times a month." (*Id.* at 171). In addition to touching her breasts, Clement would put his hands under her clothes and touch her vagina. (ECF No. 24-29 at 171-72). Clement would begin these assaults by rubbing A.C.H.'s stomach, and would ignore A.C.H.'s attempts to stop him by pushing at him with her arms. (*Id.* at 173). Clement would insert his finger into A.C.H.'s vagina "most of the time" during these encounters. (*Id.* at 174). A.C.H.'s grandmother was in bed during the assaults. (*Id.*). A.C.H. told her sister, A.S.H., about what Clement did to her after Clement stuck his finger inside her mouth. (*Id.* at 174-76). A.C.H. pointed out Clement to the jury, identifying him as the man who sexually abused her. (*Id.* at 177). In response to questioning that Mullins objected to as leading, A.C.H. testified that, starting in September 2005, Clement sexually abused her every time she stayed with her grandmother until the date her parents were told about Clement's actions. (ECF No. 24-29 at 180-81).

The next witness called by the State was Howell. (*Id.* at 198). Howell testified that he was married to Amy Howell, and was the father of A.S.H. and A.C.H. (*Id.*). Howell stated that he had known Clement for approximately 15 years as the live-in boyfriend of Howell's mother-in-law, Ms. Candler. (*Id.* at 198-99). Howell stated that his children

frequently stayed the night at Ms. Candler's residence, and he trusted Clement to look after the children along with Ms. Candler. (*Id.* at 199). Ms. Candler suffered from manic depression and bipolar disorder. (*Id.* at 200). Howell asserted that A.S.H. and A.C.H. would take "turns" visiting Ms. Candler, and one, or both of them, would stay the night "every weekend" generally. They would additionally frequently go to their grandmother's house on weekday evenings to do homework. (*Id.*).

Howell relayed that in January 2007, A.S.H. told him that "Papa Bear had been touching her private parts." (*Id.* 201-02). Howell informed the jury that his daughters referred to Clement as "Papa Bear." (ECF No. 24-29 at 202). This conversation occurred approximately at midnight, shortly after Howell arrived home following his shift as a West Virginia State Trooper. (*Id.* at 200-02). At the time that A.S.H. informed Howell what Clement had done to her, A.C.H. was spending the night at Ms. Candler's house. (*Id.* at 202). Howell woke up his wife and told her what A.S.H. had said. They then went to Ms. Candler's house and retrieved A.C.H. "as soon as daylight broke." (*Id.*). Howell informed, Bob Workman, a fellow West Virginia State Trooper, about the accusations and arranged forensic interviews for the children. (*Id.* at 203).

Howell acknowledged that he and his wife separated in December 2005 and subsequently divorced, but reconciled in October 2006 and later remarried. (*Id.* at 206). Howell admitted that he was aware Clement had helped Ms. Howell obtain the divorce and had assisting her in paying for a divorce attorney; however, Howell claimed that he had harbored no animosity toward Clement and had continued to have a good relationship with him. (ECF No. 24-29 at 206-07).

On cross-examination, Howell acknowledged that he had spoken briefly with Clement while Clement was in a police car following his arrest on the sexual abuse charges

and had informed Clement that he intended to press charges and prosecute Clement to the "fullest extent." (*Id.* at 208). Under questioning, Howell denied that the arresting officer, Trooper Workman, was a close friend and disagreed that criminal complaints relating to a law enforcement officer or his family were usually investigated by unrelated law enforcement agencies. (*Id.* at 208-09).

Mullins asked Howell why he waited until the next morning to retrieve A.C.H. after A.S.H. informed him that Clement had been molesting the girls. (*Id.* at 211). Howell replied that it was almost 4:00 in the morning by the time A.C.H was done informing him, and later explained that he waited until morning both because he believed A.C.H. would be asleep at that time, and because he was scared Clement would kidnap his daughter or run away to Mexico if he confronted him immediately. (*Id.* at 212, 227-28). Howell explained these fears were based on the fact that A.S.H. informed him Clement had talked of taking her to the beach, and that Clement had previously spoken of his wish to retire in Mexico and "had Mexico tapes," which he had been using to learn the language. (ECF No. 24-29 at 227-28). Howell admitted that he was present when the girls were interviewed regarding their allegations, but stated he merely sat in the waiting room nearby and did not participate in the interview process. (*Id.* at 212-13).

Mullins also asked Howell if he could recall an incident involving Amy Howell, which took place on February 15, 2003 at a Super 8 Motel in Beckley, West Virginia. Howell responded affirmatively. (*Id.* at 214). Following an objection by Mr. Harris, an *in camera* hearing was held and Mullins explained the incident involved a "domestic situation" between Howell and his wife, which Mullins wished to raise to show that Clement had, following this incident, begun to advise Ms. Howell to leave her husband, creating a rift between Clement and Howell. (*Id.* at 214, 216-17). Mullins was permitted

to continue questioning Howell regarding any potential animosity toward Clement, but was admonished to avoid bringing in extraneous or irrelevant details. (*Id.* at 221). Mullins noted that the allegations against Clement arose "just a few months" after Howell and his wife reconciled, and again asked Howell if he harbored any resentment toward Clement for his role in assisting Ms. Howell to obtain a divorce. (*Id.* at 226). Howell stated that he continued to enjoy a good relationship with Clement following the divorce, and asserted that he had "no harsh feelings at all" toward Clement. (ECF No. 24-29 at 226-27).

Rebecca Wood was then called to the stand and was recognized as an expert in the field of clinical psychology, over an objection by Mullins. (*Id.* at 231-35). Ms. Woods explained that she met bi-weekly with A.C.H. and A.S.H. as their therapist. (*Id.* at 236). Ms. Woods began treating the minor children for anxiety and depression. A.S.H. exhibited multiple concerning symptoms such as self-harm, depression, anxiety, avoidance behavior, nightmares and panic attacks. (*Id.* at 237). A.C.H. also presented multiple symptoms such as intrusive thoughts, avoidance behavior, academic decline, severe anger outbursts, and nightmares involving Clement. (*Id.* at 239). Ms. Woods testified that, in her professional opinion, both victims exhibited symptoms consistent with having experienced sexual abuse. (*Id.* at 240). On cross-examination, Ms. Woods agreed that her focus was treatment, and she made no attempt to determine the credibility of the underlying accusations. (ECF No. 24-29 at 243).

Corporal Workman was called as the next witness. He testified that he had assisted in the arrest of Clement, and confirmed that Clement was born on July 13, 1951. (*Id.* at 245-46). Following this testimony, the State rested its case and the jury was dismissed. (*Id.* at 247, 251). After the jury was dismissed for the day, the parties and the Circuit Court discussed a motion submitted by Mullins arguing that the counts lacked specificity and

should be dismissed. (*Id.* at 251-52). Mr. Harris argued, by contrast, that the State was entitled to charge that the sexual assaults occurred monthly as to each victim during the relevant time period, and was not required to prove specific dates, as the crimes involved young children who could not be expected to recall with specificity when the assaults occurred. (*Id.* at 254).

The Circuit Court considered the issue and stated that it could "really see the argument from both sides here," but acknowledged that "it's going to be very difficult for [the victims] to give specific dates as to when certain activity occur, [sic] and the only evidence you're going to have is the --if believed by the jury, would be that they occurred every month over a certain period of time." (*Id.* at 256-57). The Circuit Court ultimately concluded that "when looking at this evidence in the light most favorable to the State of West Virginia and crediting all issues that the jury could decide in favor of the State based on this evidence, I feel that the State has presented a *prima facie* case which will permit this case to go to the jury;" accordingly, the motion to dismiss the charges was denied. (ECF No. 24-29 at 257).

Mullins then requested he be permitted to introduce audio and video recordings of interviews of the victims conducted during the investigation of the criminal charges. (*Id.* at 257-58). Mr. Harris objected to the introduction of these recordings, arguing that they were not relevant as the victims had testified and Mullins had not established that the victims made any inconsistent statements in the prior interviews. (*Id.* at 259). Mullins explained that he had hired an expert who was prepared to testify regarding deficiencies in the interview process, and Mullins believed that the jury should be permitted to see the evidence on which this conclusion was based. (*Id.* at 260). Mullins stated he also believed the recorded interviews would reveal that, contrary to Howell's assertion he was not

involved in the interview process, Howell was present as he could be heard laughing and talking on the tapes. (*Id.* at 261). The Circuit Court stated that the issue would be taken up again on the next day of trial, but that unless the interviews revealed inconsistencies in the testimony of the victims, having the defense's expert testify as to deficiencies in the investigation without playing the recorded interviews would likely be sufficient. (*Id.* at 263-64).

At the resumption of trial the next day, the parties again addressed the issue of the introduction of the recorded interviews. (ECF No. 24-30 at 5). Mullins stated that, upon reviewing the interviews, he had identified several inconsistencies; specifically, there was discussion in the interviews regarding assaults which took place in an automobile that had not been mentioned during the trial testimony. (*Id.* at 5-6). Mr. Harris contended that if Mullins wished to question the victims regarding inconsistencies, the proper time to do so would have been when they testified previously. Mr. Harris added that the recorded tapes did not establish any misrepresentation by Howell regarding his involvement in the interview process. Howell testified that he waited nearby, which was not inconsistent with his laugh being audible on the recordings. (*Id.* at 7-8).

The Circuit Court ultimately concluded that merely because some incidents were discussed in the interview, which were not raised at trial, that did not establish that the victims made inconsistent statements. (*Id.* at 8-9). With respect to Howell, the Circuit Court agreed that Howell could be heard on the recorded interview tapes "laughing or hollering or screaming or whatever," which appeared "inappropriate" given the serious nature of the interviews, but concluded that the recording was not inconsistent with Howell's testimony that he was in a nearby waiting room during the interviews. (*Id.* at 9). The Circuit Court held that the defense's expert witness could testify regarding his review

12

of the interview process, including his review of the recorded interviews, and speak to any deficiencies he observed, but that admission of the tapes themselves was not necessary or permitted by West Virginia evidentiary rules. (*Id.* at 10-11). The Circuit Court agreed with Mullins that the victims could be called back and any potential inconsistencies further developed, which might result in a change in the ruling. (ECF No. 24-30 at 11-12).

The first witness called by the defense was Corporal Workman, who testified that he was both the arresting and investigating officer in the case. (*Id.* at 14). Corporal Workman agreed that he was a friend of Howell, but denied that it was unusual for him to have investigated a criminal case in which he had a personal relationship with individuals involved in the case. (*Id.* at 16-17). Corporal Workman acknowledged that Howell was present at the scene when Clement was arrested, and that Howell spoke with Clement while Clement was sitting in the police car, but denied hearing what Howell said to Clement. (*Id.* at 24-25). Corporal Workman agreed that he had not interviewed Ms. Candler regarding the allegations, stating that when he arrived to arrest Clement, she said "I didn't know this was going on." (*Id.* at 28-29). Corporal Workman conceded that he did not conduct any further investigation into the case. (*Id.* at 29).

Ms. Howell was the next witness to testify for the defense. (ECF No. 24-30 at 32). Ms. Howell stated that, following the revelations by her daughters that Clement had touched them inappropriately, she went to the police station and reported a similar incident which occurred in 2004 when Clement had grabbed Ms. Howell's breast, attempted to kiss her, and put his hand inside her pants. (*Id.* at 36-37). Ms. Howell did not report the incident at the time because she was worried it would interfere with her husband's career if he reacted violently. (*Id.* at 37). When asked why she continued to allow her daughters to spend the night with Clement, unsupervised, following this

13

incident, Ms. Howell stated she did so because "I did not know he was lusting after my children. I thought he was only lusting after me as a grown woman." (*Id.* at 38). Ms. Howell further relayed that during the summer of 2006, Clement "made a big deal" about A.S.H. wearing a bikini, following which Ms. Howell told A.S.H. not to wear a bikini around Clement, and further told the girls to "keep an eye on one another, you know, if he did anything to them to come and tell me," but did not stop the girls from visiting and spending the night. (*Id.* at 38-39).

Ms. Howell stated that the girls would visit their grandmother's house "every day to every other day and on the weekends, the children would take turns." (*Id.* at 40). Ms. Howell explained that when the children visited, Ms. Candler would care for them. (ECF No. 24-30 at 41). Ms. Howell said that Clement largely watched television by himself when the children visited, although he would help them if they encountered issues with the computers. (*Id.* at 44). Ms. Howell told the jury that she viewed Clement "like family," and that he "was like a step-dad to me and a grandpa to my children." (*Id.* at 44-45). Ms. Howell acknowledged that Clement supported her in her decision to obtain a divorce and assisted her in doing so, but denied that Howell was upset about this, asserting that he "was happy that he didn't have to pay for the divorce." (*Id.* at 47-48). Ms. Howell revealed that Ms. Candler and Clement would argue, and Ms. Candler told Ms. Howell that Clement had "been physical with her." (*Id.* at 50).

On cross examination, Ms. Howell stated that Clement would cook meals for the children when they visited, and would occasionally watch television with them, but largely watched television alone. (*Id.* at 57). Ms. Howell stated she believed that when Ms. Candler went to sleep, Clement would also be asleep and did not expect him to watch her children during that time. (ECF No. 24-30 at 58). On re-direct examination, Ms. Howell

agreed that it was her understanding that her children were under the "care and control" of Ms. Candler when they visited. (*Id.* at 61). Clement was allowed to verbally discipline the children, but not permitted to use physical discipline, which was a point of contention for Clement. (*Id.* at 65-66). Ms. Howell agreed, on re-cross examination, that Clement was entrusted with keeping her children safe when they visited in the event of a fire or other emergency. (*Id.* at 64-65).

Ms. Candler was the next witness to take the stand for the defense. (*Id.* at 68). Ms. Candler stated that she and Clement had been in a relationship for approximately 15 years and lived together preceding and during the time of the criminal charges. (*Id.* at 68-70). Ms. Candler asserted that her grandchildren, A.S.H. and A.C.H, came to her house "just about every weekend" and frequently on the weekdays. (ECF No. 24-30 at 70-71). Ms. Candler stated that Clement was abusive to her during this time period, and she and Clement did not love each other any longer. (*Id.* at 73). Ms. Candler stated that Clement was "part of our family" until what he did was revealed. (*Id.* at 74). Ms. Candler asserted that she, her grandchildren, and Clement would go shopping together and "for some reason he wanted to buy [A.S.H.] everything," and he would spend money they could not afford buying A.S.H. gifts. (*Id.* at 77).

Ms. Candler related an incident where she awoke to use the bathroom one night and saw the light on in A.C.H's bedroom. When Ms. Candler entered the bedroom, she observed A.C.H. sitting on Clement's lap. Clement then "jerked his hands back" which had been "down here at [A.C.H.'s] bottom parts." (*Id.* at 81). Ms. Candler asserted that "I don't guess he heard me coming, because every time he'd hear me coming, he would pretend like everything was normal with him and the kids." (*Id.*).

Ms. Candler recalled an additional incident wherein she observed Clement

"halfway on [A.S.H.] and he had his hands up — rubbing — rubbing her back." (ECF No. 24-30 at 82). When Ms. Candler "asked him what the hell he was doing," Clement said he was giving A.S.H. a massage. Ms. Candler ordered Clement to "get the hell away from her and you get on the loveseat and leave her the hell alone." (*Id.*). Ms. Candler did not indicate that she took any further actions, or informed anyone, regarding these incidents. (*Id.*).

The defense next called Dr. David Clayman to testify as an expert witness, and he was duly recognized as such by the Circuit Court. (*Id.* at 89-90). Dr. Clayman explained that he was a forensic psychologist and his professional expertise consisted of assessing the credibility and veracity of individuals' statements in legal cases. (*Id.* at 90-92). Dr. Clayman testified that he had been retained to judge the quality of the criminal investigation of Clement, and that he found the process to be worrisomely "cursory," consisting of only 36 minutes of interviews with both victims. (*Id.* at 95). After inquiring if the jury had viewed the interview tapes and affirming that he was allowed to describe the content of the tapes, Dr. Clayman related to the jury that he observed some issues with how the interviews were conducted in that the interviewee failed to pursue significant details or extract more information, vague answers were permitted without elaboration, and the interviewee did not make sure the victims knew the difference between the truth and a lie. (ECF No. 24-30 at 87-100). Dr. Clayman believed the interview process failed to elicit enough details regarding the assaults, which were only vaguely described, as the victims were "not very forthcoming," and were not able to give pertinent details. (*Id.* at 100-01).

Dr. Clayman further noted that the victims "both told the exact same story, using almost the exact same words," which could point toward coaching or rehearsing of the

stories. (*Id.* at 102). Dr. Clayman acknowledged that this could also simply mean that "it happened as they said and there's no details to embellish…" (*Id.* at 104). Dr. Clayman additionally acknowledged that the victims did not provide exaggerated details or describe the events using adult terms, actions consistent with their stories being true. (*Id.* at 102). Dr. Clayman stated it was a concern that the interviewee "pursued with the assumption that something bad had happened to the children with no effort to determine whether there was veracity there," a practice he believed was detrimental to weighing the credibility of the victims' stories. (*Id.* at 104). Finally, Dr. Clayman told the jury that self-destructive behaviors exhibited by the children could be triggered by events other than sexual abuse. (ECF No. 24-30 at 104-05).

Following Dr. Clayman's testimony, Mullins again requested that the recorded interviews be played for the jury. (*Id.* at 109-10). The Circuit Court denied the request. (*Id.* at 112-13). Clement then took the stand to testify in his own defense. (*Id.* at 121). Clement testified that Ms. Howell would consult with him regarding her relationship troubles with Howell, and Clement assisted her in obtaining a divorce. (*Id.* at 138-40). When Ms. Howell reconciled with Howell and the two remarried, Clement objected "very strenuously" and refused to attend the wedding. (*Id.* at 140).

Clement testified that A.S.H. and A.C.H. did not visit very often in 2006, because their father had custody of them on the weekends. (*Id.* at 146). Clement further testified that in 2005, Ms. Howell would sometimes bring A.S.H. and A.C.H. over on Sundays, but she never left them there overnight. (ECF No. 24-30 at 147). Clement asserted that following his arrest, Howell spoke to him while he was sitting in the police car, saying, "I'm here to show you you can't interfere with a trooper and his family. My friends here are going to take you to jail and my other friends will see you never get out of jail." (*Id.* at

17

151). Howell told Clement he would "rot in jail." (*Id.*).

Clement stated that, with respect to the victims and their parents, "I looked upon these as my family and my grandchildren, and I've tried to provide the best that I could for the family." (*Id.* at 151-52). Clement asserted he never abused the victims. (*Id.*). On cross examination, Clement denied saying that the victims never spent the night at his residence during 2005 and 2006, and stated he had merely said they spent the night less during that time than they had previously. (*Id.* at 155). Clement testified he believed Howell convinced the victims to make up their stories, because Howell was upset that Clement helped his wife get a divorce. (ECF No. 24-30 at 157-58).

At the conclusion of Clement's testimony, the defense rested and requested a judgment of acquittal, asserting that the State had presented insufficient evidence. (*Id.* at 164, 167-78). The Circuit Court denied the motion, holding that the State had presented sufficient evidence for the jury to convict Clement. (*Id.* at 169). The parties then began discussing jury instructions, and Mullins entered a series of general objections that the instructions were "confusing and misleading." (*Id.* at 171-74). Mullins requested that a curative instruction be included with respect to evidence presented of uncharged crimes. (*Id.* at 175-76). The Circuit Court agreed, and the parties jointly drafted a curative instruction to be included. (*Id* at 185-86).

The Circuit Court provided the instructions to the jury. (*Id.* at 188-215). Ms. Hewitt then presented the State's closing argument, asking the jury to "[t]hink of what it took" for the victims to sit in front of the jury and give the very personal testimony they presented. (ECF No. 24-30 at 216). Ms. Hewitt stated that for "a long period of time [the victims] were being molested" by Clement. (*Id.* at 216). Ms. Hewitt disparaged the defense's attempt to suggest Howell fabricated the charges, and asked the jury to find

Clement guilty on all counts. (*Id.* at 217-223). Mullins presented the closing argument for the defense, pointing out that Howell was a West Virginia State Trooper with knowledge of interrogation techniques, and that Dr. Clayman had testified he was concerned there may have been coaching of the victims. (*Id.* at 228-30).

Following the State's rebuttal, the jury was dismissed to deliberate, leaving at 4:32 p.m. (*Id.* at 242-44). Subsequently, the parties reconvened to discuss a question posed by the jury, asking if they were allowed to view the recorded interviews. (*Id.* at 244-45). The Circuit Court overruled Mullins's request that the jury be informed Clement had specifically requested the recorded interviews be admitted, and instead instructed the jury that it had already been presented "all the competent and admissible evidence that this Court has deemed admissible into the trial of this case." (ECF No. 24-30 at 245-46). The jury then was dismissed for further deliberation. (*Id.* at 246). At 8:02 p.m. the jury returned from deliberation and announced a verdict of guilty on all counts. (*Id.* at 249-51).

On February 8, 2008, Mullins submitted a Motion for a New Trial on Clement's behalf, alleging eight grounds for overturning the verdict. (ECF No. 24-5 at 2-3). On March 24, 2008, following a sentencing hearing which took place on March 20, 2008, the Circuit Court entered a Sentencing and Commitment Order sentencing Clement to an aggregate term of 61 to 195 years' imprisonment on all 96 counts of conviction. (ECF No. 24-7 at 2-5). At the sentencing hearing, the Circuit Court also addressed Clement's motion for a new trial, concluding that the only argument raised by Clement at the hearing, that the Circuit Court erred by excluding the video and audio interviews of A.C.H. and A.S.H., did not entitle Clement to have his convictions overturned. (*Id.* at 2-3).

On April 1, 2008, Clement filed a notice of intent to appeal in the Circuit Court. (ECF No. 9-1 at 9). Clement then received an extension of time to perfect his appeal from both the Circuit Court and the Supreme Court of Appeals of West Virginia ("WVSC"). (*Id.* at 9-10). In February 2009, Clement was resentenced for the purpose of allowing him additional time to file a direct appeal. (*Id.* at 10).

Clement, through Mullins, perfected his appeal to the WVSC on June 12, 2009. (ECF No. 24-9 at 2). In his petition for appeal, Clement raised five assignments of error:

1. The [Circuit Court], over objection, did not allow into evidence, exculpatory evidence in the form of audio and video recordings initially conducted by the West Virginia Department of Health and Humans Resources' in-take worker. Further because of this exclusion, the jury was not allowed to see and/or hear this crucial piece of evidence, thus, denying [Clement] a fair trial and resulting in a verdict based upon partial facts;

2. The [Circuit Court], over objection, did not allow into evidence, exculpatory evidence in the form of audio and video recordings initially conducted by the West Virginia Department of Health and Human Resources' intake worker. This evidence was to be offered for impeachment purposes to demonstrate inconsistencies in the two alleged victims['] trial testimony and to make obvious the deficiencies in the interview process, therefore, denying [Clement] a fair trial;

3. Two (2) excused jurors engaged in misconduct which denied [Clement] a fair trial[.] [The jurors] were questioned in chambers by the Judge, the State and [Clement] during *voir dire* as to whether, "... they or a member of their family had been a victim of sexual abuse or assault[.]" [The jurors] were observed by the entire jury pool as they exisited [sic] the courtroom, expressing outward emotion in the form of "crying." This observance of outward emotion by the jury pool of potential jurors tainted the potential jury pool and in turn prejudiced the jurors that make the final selection, thus denying [Clement] a fair trial from the commencement of these peceedings [sic];

4. The conduct of the Prosecutor Attorney during closing arguments was inflammatory and denied [Clement] a fair trial;

5. The verdict of the jury is against the weight and sufficiency of the evidence[.]

(ECF No. 24-9 at 11-12). On September 9, 2009, the WVSC refused Clement's petition for appeal. (ECF No. 24-10 at 2).

### B. First State Habeas Proceedings

On March 2, 2010, Clement filed a state habeas petition, entitled Petition for Writ of Habeas Corpus Ad Subjicienium, in the Circuit Court, alleging the following eleven grounds for relief:

A. …[T]he prosecution comment's [sic] were false and misleading, violating [Clement's] constitutional rights to a fair trial[;]

B. …[T]he prosecution withheld or suppressed favorable medical records in violation of [Clement's] due process constitutional rights to the Fourteenth Amendment[;]

C. …[The Circuit Court] violated [Clement's] constitutional rights to due process to the Sixth and Fourteenth Amendment to present a [sic] effective defense by not permitting the video and audio tape of the allege[d] victim[s'] into evidence to be viewed by the jury when the [Circuit] Court used West Virginia Rules of Evidence mechanistically without evaluating whether the interest served by the rule justified the total limitation imposed on [Clement's] constitutional right to present an effective defense[;]

D. …[Clement's] constitutional rights to due process of the Fourteenth Amendment and his fundamental right[] to have the jury instructed as to the law were violated due to the fact that the [Circuit Court] failed to instruct the jury regarding the sexual conduct he allegedly committed regarding his sexual abuse by custodian offense which was flawed, incomplete, misleading and confusing[;]

E. …[The Circuit Court] violated [Clement's] constitutional rights to due process of law by failing to complete the instruction to the jury regarding an essential element of the offense charges [sic] forcible compulsion[;]

F. …[Clement] was convicted and punished for first degree sexual assault in violation of due process and the principle of *ex post facto* law [sic] of West Virginia and United States Constitution[][;]

G. …The prosecution violated [Clement's] constitutional right[s] by making inflammatory statements during closing arguments[;]

[H.] …[Clement's] conviction under West Virginia Code 61-8B-3 and 61-8B-4 sexual assault in the first degree and second degree was unconstitutional

in violation of both the state and federal constitution of West Virginia [sic] Article VI, Section 30 and Due Process and Equal Protection Clauses of the 5th and 14th Amendments to the United States Constitution[;]

I. ...Counsel was ineffective assistance [sic] in violation of [Clement's] Sixth Amendment constitutional rights[;]

J. Counsel [provided] ineffective assistance by failing to request [a] care and caution instruction in violation of [Clement's] constitutional right to due process[;]

K. Cumulative Error Doctrine[;]

(ECF No. 24-11 at 3-4). Regarding Clement's claim of ineffective assistance of counsel, Clement asserted that he had been deprived of effective assistance of counsel due to Mullins's (1) failure to call "Mr. Howell's sister," who could have impeached the victims' testimony; (2) failure to subject the State's case to meaningful adversarial testing by pointing to the lack of physical evidence; (3) failure to hire an independent expert to discredit the State's position that there was unlikely to be any physical evidence given the nature of the case; (4) failure to subpoena records of the victims' medical records and "genital examinations;" (5) failure to call school personnel who would show that the victims' grades were failing not due to sexual assault but because they were "rebellious" children; (6) failure to call a witness, Dorothy Brooks, who could discredit the victims' accusations; (7) decision to call Ms. Candler to testify; (8) decision to call Ms. Howell as a witness; (9) failure to request a cautionary instruction regarding Ms. Howell's and Ms. Candler's testimony; and (10) failure to request a cautionary instruction regarding the prosecutor's inflammatory statement. (ECF No. 24-11 at 45-50).

On March 15, 2010, the Circuit Court appointed counsel to represent Clement throughout his state habeas proceedings. (ECF No. 24-17 at 14). In August 2011, Clement's counsel, D. Adrian Hoosier, II, ("Hoosier") filed a Habeas Corpus Notification form, or

"*Losh* list" with the Circuit Court.[1] (*Id.* at 15). In February 2012, Hoosier filed an Amended Petition for Habeas Corpus relief, which was largely identical to the petition submitted by Clement *pro se*. (ECF No. 24-12). The following month, Hoosier filed a Supplemental Amended Petition for Habeas Corpus Relief, which contained the same grounds for relief as the previous petitions, while providing some additional argument related to Clement's claim of ineffective assistance of counsel. (ECF No. 24-13 at 57-61).

On June 28, 2012, Clement submitted a *pro se* document entitled Supplemental Petition, wherein he alleged that his indictment was defective as the sexual assault counts were not sufficiently differentiated. (ECF No. 24-14). Following motions and hearings related to Clement's request that he be granted the appointment of expert witnesses to examine the victims, and to speak to the issue of ineffective assistance of counsel, as well as letters from Clement expressing his dissatisfaction with the performance of Hoosier, the Circuit Court held a hearing on November 5, 2012, attended by Clement and his attorney. (ECF No. 24-17 at 17-20). At the hearing, the Circuit Court instructed Clement to cease communicating *ex parte* with the Circuit Court, authorized Hoosier to hire a legal expert to address Clement's ineffective assistance of counsel claims, and directed Hoosier to obtain a written opinion from the medical expert with whom Hoosier asserted he had been in communication. (*Id.* at 20). According to Hoosier, the medical expert had informed Hoosier that he was unable to provide the medical opinion Clement sought. (*Id.*).

On November 15, 2012 an omnibus evidentiary hearing was held on Clement's habeas petition. (ECF No. 24-31 at 2). The Circuit Court began the hearing by exhaustively

---

[1] A *Losh* checklist is a list of all alleged trial errors that is filed by a petitioner in a state habeas proceeding. *See Losh v. McKenzie*, 277 S.E.2d 606 (W. Va. 1981).

going over the *Losh* list prepared by Clement and his attorney. (*Id*. at 8-12). Mullins was called as Clement's first witness. Mullins explained that he was currently disbarred, but at the time of Clement's trial had been a practicing criminal defense attorney for approximately twenty years. (*Id*. at 14-16). Mullins asserted that he and Clement made a "tactical decision" to not request the victims be evaluated by a psychologist or physician, because there was a risk the evaluation would give "a reaffirmation that supports the State's case." (*Id*. at 18-19). Mullins recalled that the case essentially came down to a "credibility issue" as there was no physical evidence, and the State's case rested largely on the testimony of the two victims. (*Id*. at 22). Mullins attempted to obtain a medical opinion stating that the victims were falsifying their testimony; however, Dr. Clayman was only willing to testify regarding issues he perceived in the investigation of the case, and was unwilling to give an opinion regarding the credibility of the victims. (*Id*. at 31). Clement did not have the resources to seek a second professional opinion, so they were forced to shift the defense strategy to criticizing the nature of the investigation, rather than the victims' credibility directly. (ECF No. 24-31 at 31-32).

Mullins agreed that, with more financial resources, he would have sought a second opinion regarding the victims' credibility. (*Id*. at 33-34). Clement retained Mullins and paid for his services. Occasionally, a family member named Dorothy Brooks would bring the payment on Clement's behalf. (*Id* at 35). Describing plea negotiations with the State, Mullins believed that Mr. Harris "felt like he had a very firm case," and "felt that Clement needed to go away for the rest of his life." (*Id*. at 38). Mullins explained this meant the State was relatively unwilling to offer favorable plea deals, making offers such as "[w]e'll let you plead guilty to ten and we'll drop twenty." (*Id*.).

When asked why he did not question the witnesses about the lack of physical

24

evidence, Mullins explained that, due to the lack of physical evidence, the State's case relied on the testimony of the victims, and Mullins believed the best trial strategy was to "attack the procedural foundation for the allegations rather than me attack under cross-examination these two young children." (*Id.* at 58). Mullins was concerned that aggressive questioning of the minor witnesses would backfire by inspiring sympathy in the jury or revealing more damaging information. He explained, "[i]t was a trial decision of mine not to go after these two children, to let Mr. Harris get them up and get them off." (*Id.*). Mullins was "quite pleased" that the victims' testimony was relatively short and did not involve a great amount of detail or emotion. (ECF No. 24-31 at 58).

With regard to Clement's claim that Mullins provided ineffective assistance by failing to obtain a medical expert regarding the lack of physical evidence, Mullins stated "I have no understanding of what a medical expert would bring to the picture." (*Id.* at 62). Mullins noted that the charges were brought forth long after the events were alleged to have occurred, and a physical evaluation of the children would have had no relevance to the case. (*Id.*). Mullins asserted he did not recall a report from Dr. Sharma, which detailed a request by Ms. Howell to have her daughter evaluated. (*Id.* at 64).

Mullins stated that he if did not object to statements made by the prosecutor which were arguably inflammatory, "my belief was the damage of bringing that forward and bringing it acutely to the attention of the jury was more prejudicial to" Clement than letting it pass without objection. (*Id.* at 71). Mullins further asserted that he discussed and investigated potential witnesses with Clement, but "the case was not an expansive case to where there were a lot of people to be interviewed." (*Id.* at 72-73). Mullins explained he did not question the victims regarding specific dates and times the assaults occurred because he did "not see anything that would have been gained" by this line of questioning,

as it would have merely resulted in "these two young, innocent, sympathetic victims in front of the jury for just longer and longer periods of time to gain more sympathy and more compassion from the jury." (ECF No. 24-31 at 79).

Mullins testified that he did not see much benefit in attacking the case on the ground that Clement could not be a custodian of the victims given that Clement had a close relationship with the family, exercised supervisory responsibility over the victims, and were considered to be a grandfather by the victims. (*Id.* at 80-81). After conferring with Clement to see if he wished additional questions to be asked, Hoosier stated he had no further questions of Mullins. (*Id.* at 86).

On cross-examination, Mullins explained that Clement did not wish to take a plea deal, which would result in a long sentence, due to his age. (*Id.* at 87-88). Mullins stated he and Clement discussed the possibility of a plea deal, and what Mr. Harris had offered, but elected to go to trial. (*Id.* at 88). Mullins agreed that he would have requested medical records from Dr. Sharma if there was an indication the victims had undergone any type of medical evaluation. (*Id.* at 92-93).

Following the hearing, the *Losh* list reflecting the grounds Clement wished to raise was entered into the record. (ECF No. 24-15). On December 21, 2012, Hoosier filed a document entitled "Additional Grounds for Habeas Corpus," a document the Circuit Court believed to have been drafted by Clement. (ECF No. 24-17 at 25). The document argued that it was "prosecutorial misconduct and abuse of judicial discretion" to allow the convictions for abuse by a custodian to stand when the trial testimony established that Clement was not a custodian. In addition, the document asserted that trial counsel was ineffective for failing to inform Clement of a favorable plea deal. (*Id.*). On May 8, 2013, Hoosier requested a second habeas hearing and permission to submit proposed findings

of fact and conclusions of law for the Circuit Court to review. (*Id.*). On June 19, 2013, Hoosier submitted his Proposed Findings of Fact and Conclusions of Law. (*Id.*).

On June 24, 2013, a second evidentiary hearing on Clement's habeas petition was held in the Circuit Court; however, Hoosier called no witnesses at the hearing and the only witness to testify, Ms. Howell, was called by the State. (*Id.*). Hoosier and the State noted their agreement that Clement had received an improper sentence with respect to some of the counts of conviction. (*Id.* at 26).

Following the hearing, on July 17, 2013, Hoosier submitted a second "Proposed Findings of Fact and Conclusions of Law" ("Proposed Findings") and a "Supplemental Proposed Findings of Facts and Conclusions of Law" ("Supplemental Proposed Findings"). (ECF No. 24-17 at 26). The Circuit Court believed that the former was drafted by Hoosier, and the latter, which was "far less polished" and signed by Hoosier, was drafted by Clement or a "jailhouse lawyer" at his behest. (*Id.* at 26 n.25). Clement, by contrast, maintains that Hoosier drafted the Supplemental Proposed Findings, and Clement, with the assistance of a "legal aide," in fact drafted the Proposed Findings . (ECF No. 11 at 5 n.3). In the Proposed Findings, eight grounds for relief were listed:

> 1. The Court [e]rred by not dismissing the thirty-two (32) counts of Sexual Abuse by a Parent, Guardian or Custodian due to the fact that the mother of the alleged victims testified [Clement] was not a parent, guardian or custodian.
>
> 2. The Court [e]rred by not allowing any of the vital evidence of VHS tapes, [d]igital [a]udio recordings, CDs, or transcribed transcripts into trial.
>
> 3. The Court [e]rred by in its discretion [sic] to permit the seating of a possible biased and prejudiced juror when said juror was related to an arm of law enforcement and such relationship could be presumed prejudice under the Rules of Criminal Procedure and the Sixth and Fourteenth Amendments resulting in denial of a fair and impartial jury.

4. The rights of [Clement] were violated by the State of West Virginia in that two (2) excused jurors that were questioned in chambers by the Judge, the State and [Clement] during voir dire as to whether, "[t]hey or a member of their family had been a victim of sexual abuse or assault," were observed by the entire jury pool as they existed [sic] the courtroom, expressing outward emotion in the form of "crying." This observance of outward emotion by the jury pool of potential jurors tainted the potential jury pool and in turn prejudiced the jurors that made the final selection, creating undue prejudice against [Clement], therefore denying [Clement] a fair trial, even before the commencement of the proceedings.

5. Prosecutorial [m]isconduct.

6. The State did not prove beyond a reasonable doubt the allegations proffered by A.S.H.

7. Ineffective [a]ssistance of [c]ounsel.

8. Cumulative [e]rror [d]octrine.

(ECF No. 24-17 at 26-27) ([sic] in original). In the "Supplemental Proposed Findings of Facts and Conclusions of Law," Clement listed over thirty grounds for relief. (*Id.* at 27-32). On July 18, 2013, Clement and Mr. Harris submitted a stipulation agreeing that Clement's sentence should be modified for certain counts of first-degree sexual assault because the penalty for that offense was lower at the time Clement committed the offenses than when he was sentenced for the offenses, and the Circuit Court had sentenced Clement using the higher statutory penalty range. (ECF No. 24-16 at 2-3). On September 27, 2013, the Circuit Court filed a 110-page Opinion and Order denying Clement's claims, with the exception of his claim that he had been improperly sentenced. (ECF No. 24-17).[2]

As to Clement's claim, that he was improperly sentenced, the Circuit Court modified Clement's sentence on thirteen counts of first-degree sexual assault in accordance with the parties' stipulation. (*Id.* at 109-110). The resulting sentence consisted

---

[2] Given the number of grounds, and the extensive analysis pertinent to each ground, the opinion denying Clement's habeas petition will be discussed in full when analyzing Clement's substantive claims for relief.

of an indeterminate period of imprisonment of 15-35 years with respect to the 13 convictions for sexual assault in the first degree related to conduct that occurred before the relevant act was amended in September 2006, and 25-100 years imprisonment for the 3 convictions related to conduct that occurred after the sexual assault act was amended. (*Id.* at 110). These counts were all ordered to run concurrently. The sentencing order remained otherwise unchanged, and, as three convictions still contained the higher range of 25-100 years, and were running concurrently with all other convictions of sexual abuse in the first degree, Clement's sentence remained effectively unchanged. (*Id.*).

On March 4, 2014, Clement, through Hoosier, appealed the Circuit Court's denial of habeas relief to the WVSC. (ECF No. 24-18 at 2) In his brief, Clement raised three assignments of error, with a number of sub-claims. First, Clement asserted that the Circuit Court erred in not concluding that Mullins provided ineffective assistance of counsel by failing to retain an expert to address the testimony of the child victims. (*Id.* at 11-13). Next, Clement alleged that the Circuit Court erred by declining to find that Mullins was ineffective for not raising a challenge to the sufficiency of the evidence used to establish that Clement was a "custodian" of the victims. (*Id.* at 14). Finally, Clement asserted a claim of cumulative error, stating that Mullins failed to:

[a] object to State's contention that digital penetration of the vagina wouldn't leave physical damage despite no foundation;

[b] object to jury instructions;

[c] offer lesser included instructions;

[d] object to inflammatory closing argument statements made by State;

[e] call impeachment witness;

[f] retain expert to rebut State's claim that digital penetration could not leave damage to a child's vagina;

[g] subpoena victim's medical records;

[h] call school personnel to discredit victim;

[i] property [sic] prepare a witness that testified to [Clement's] prior bad acts;

[j] request cautionary instructions.

(ECF No. 24-18 at 15-16).

On April 3, 2014, the State submitted a reply to Clement's appeal, arguing that Clement failed to articulate a cognizable error. (ECF No. 24-19 at 24). In regard to Clement's 10 asserted claims of ineffective assistance of counsel under the heading "cumulative error," the State argued that Clement had effectively abandoned these claims as they contained no citations to the record and consisted merely of cursory statements. (*Id.* at 6). Respondent further noted that Clement had failed to include a proper appendix with trial transcripts and other relevant documents, although an apparently unrelated press release from the United States Attorney's Office "managed to wend its way into the appendix." (*Id.* at 7).

On April 22, 2014, Clement, purportedly through Hoosier, submitted a Reply to the State's brief. (ECF No. 24-20 at 3). Clement spent a significant portion of the reply contending that he should not have been found to be a custodian of the two victims, rendering his conviction on those grounds invalid. (*Id.* at 6-14). Additionally, Clement argued that the Circuit Court erred by not admitting into evidence the audio and video recordings of the interviews of the victims. (*Id.* at 14-15).

On November 3, 2014, the WVSC issued a memorandum decision affirming the Circuit Court's denial of habeas relief. (ECF No. 24-21 at 3). In its opinion, the WVSC found that Clement's first assignment of error, that Mullins was ineffective because he

failed to retain an expert to rebut the testimony of the victims, was "at best, disingenuous" because Mullins did in fact retain an expert who testified that it was his professional opinion the victims may have been coached. (*Id.* at 6). The WVSC noted that, to the extent Clement objected to Mullins's failure to retain a medical expert, Mullins was not ineffective because there was no relevant physical or medical evidence to uncover or rebut. (*Id.* at 7).

As to Clement's claim that Mullins was ineffective for failing to challenge the jury verdict on the basis that Clement could not be found to be a custodian of the victims, the WVSC determined that this claim lacked merit as ample evidence presented at trial supported the jury's finding. (*Id.* at 7-8). The WVSC further found that the Circuit Court had not erred in concluding Clement failed to show prejudice based on Mullins's failure to object to the exclusion of the videotaped interviews. (*Id.* at 8). Finally, the WVSC declined to address the issue of cumulative error, because Clement's brief contained "no citations to the appendix record showing when or how any of th[e] alleged errors occurred at trial," and no legal argument, contrary to West Virginia Rule of Appellate Procedure 10(c)(7).[3] (*Id.* at 9). On December 1, 2014, Clement filed a petition for rehearing, which was denied by the WVSC on January 8, 2015.[4]

### C. First Federal Habeas Proceeding

On February 27, 2015, Clement filed a § 2254 petition in this Court. (ECF No. 2). In the initial petition, Clement raises eight grounds for relief:

---

[3] West Virginia Rule of Appellate Procedure 10(c)(7) provides that an appellate brief "must contain an argument exhibiting clearly the points of fact and law presented, …. The argument must contain appropriate and specific citations to the record on appeal …. The Court may disregard errors that are not adequately supported by specific references to the record on appeal."

[4] The undersigned's office obtained this information by contacting the WVSC Clerk's Office.

1. The Trial Court, over objection, did not allow into evidence, exculpatory evidence in the form of audio and video recordings initially conducted by the West Virginia Dept. of Health and Human Resources' in-take worker. Further, because of this exclusion, the jury was not allowed to see and/or hear this crucial piece of evidence, thus, denying [Clement] a fair trial and resulting in a verdict based upon partial facts: This evidence was to be offered for impeachment purposes to demonstrate inconsistencies in the two alleged victims trial testimony and to make obvious the deficiencies in the interview process, therefore, denying [Clement] a fair trial.

2. That two (2) excused jurors engaged in misconduct which denied [Clement] a fair trial. They were questioned in chambers by the Judge, the States, and [Clement] during voir dire as to whether "(they) or a member of their family had been a victim of sexual abuse or assault?" They were observed by the entire jury pool as they exited the courtroom, expressing outward emotion in the form of "crying." This observance of outward emotion by the jury pool of potential jurors tainted the potential jury pool and in turn prejudiced the jurors that make the final selection, thus, denying [Clement] a fair trial from the commencement of these proceedings.

3. Prosecutor Misconduct: Conduct of the PA [Prosecuting Attorney] was inflammatory; PA's comments were false and misleading; withholding evidence beneficial to [Clement].

4. The verdict of the jury is against the weight and sufficiency of the evidence.

5. [Clement's] constitutional rights to due process to the Sixth and Fourteenth Amendments to present an effective defense were violated by the court not permitting the video and audio tape of the alleged victims into evidence to be viewed by the jury when the court used WV Rules of Evidence mechanistically without evaluating whether the interest served by the rule justified the total limitation imposed on [Clement's] constitutional right to present an effective defense.

6. Jury instructions were flawed, incomplete, misleading, and confusing thus violating [Clement's] constitutional rights of due process of the Fourteenth Amendment.

7. Ineffective assistance of counsel violating [Clement's] constitutional right to effective assistance of counsel:

   a. Not objecting to prosecution statements misleading and inflammatory statements to the jury.

   b. Failing to retain medical experts to rebut prosecutions claims.

c. Failure to investigate.

d. Failing to object and request [Clement's] case be analyzed based upon the long standing United States Supreme Court *Rock v. Arkansas* principles.

e. Failing to enter a specific objection to the instruction regarding the offense of sexual abuse by parent, guardian, or custodian.

f. Failing to object to trial court's incomplete instruction regarding the essential element of forceful compulsion. Without the completeness of this instruction, the jury had no way of determining whether the prosecution proved its case.

g. Failing to object to the court's violation of *ex post facto* principle in violation of [Clement's] constitutional rights.

h. Failing to enter an objection to the unconstitutional violation of the statute of sexual assault.

i. Failing to call witnesses who would have impeached the alleged victim's sexual accusation.

j. Failing to subject the prosecution's case to meaningful adversarial testing process. As the prosecution stated in closing arguments that: "Clement presented no evidence to contradict the victim's testimony."

k. Failing to hire an independent forensic expert to discredit the prosecutions statement that because [Clement] allegedly inserted his finger in the victim's vagina.

l. Failing to subpoena the alleged victim's medical records and/or genital examination.

m. Failing to investigate the alleged victim's school records.

n. Failing to call witness which was a longtime friend of the family of the alleged victims.

o. Failing to request cautionary instructions regarding other bad acts alleged by testimony.

p. Failing to object and request a cautionary instruction regarding the prosecutions' inflammatory statements.

q. Failure to communicate plea offer.

8. Actual innocence.

(ECF No. 2 at 6-16) ([*sic*] throughout). In his initial § 2254 petition, Clement acknowledged that he did not raise grounds 5, 6, and 8 in an appeal to the WVSC. (*Id.* at 11-14, 16-17). Clement explained that he asked Hoosier to raise grounds 5 and 6 during his state habeas appeal to the WVSC, but his counsel failed to do so. (*Id.* at 12, 14).

On March 23, 2015, the undersigned issued an order directing Respondent to answer Clement's petition within sixty days. (ECF No. 5). On May 13, 2015, Respondent filed an answer, (ECF No. 9), and a motion to dismiss the petition, or in the alternative, to stay proceedings and hold the petition in abeyance until Clement exhausted his state court remedies, (ECF No. 10). In both his answer and motion to dismiss, Respondent asserted that Clement failed to exhaust his state court remedies for grounds 1, 2, 3, 4, 5, 6, and 8, along with subsections c, d, g, h, and p of ground 7. (ECF No. 9 at 2; ECF No. 10 at 16). Because Clement's petition was a "mixed petition" containing both exhausted and unexhausted claims, Respondent requested that the Court dismiss the petition, without prejudice, or allow Clement to proceed only on those claims that had been properly exhausted. (ECF No. 10 at 1-2, 16).

On July 17, 2015, Clement filed an Objection to Respondent's Motion to Dismiss and Request to Grant Respondent's Motion for Stay and Abeyance. (ECF No. 11). In that filing, Clement averred that Respondent's motion to dismiss was improper in a habeas proceeding. (*Id.* at 8). On the issue of stay and abeyance, Clement insisted that he requested his state habeas counsel raise all of the grounds contained in his § 2254 petition on appeal to the WVSC, but counsel refrained from doing so. (*Id.* at 12).

On September 22, 2015, the undersigned issued Proposed Findings and

Recommendations ("PF&R"), recommending that Clement's § 2254 petition be stayed so that he might pursue his state court remedies for his unexhausted claims. (ECF No. 12). In so doing, the undersigned noted that a number of Clement's claims were not exhausted due to his failure to raise them on appeal to the WVSC. (*Id.* at 16). The undersigned declined, however, to recommend dismissal of Clement's unexhausted claims outright "[g]iven Clement's contention that his unexhausted claims are a result of ineffective assistance of state habeas counsel," and a reasonable possibility existed that the state courts might concede to address the unexhausted claims on the merits in a successive state habeas petition. (*Id.* at 18). As neither party submitted objections to the PF&R, the presiding District Judge adopted the recommendations on November 2, 2015, and stayed Clement's § 2254 petition, ordering him to return to state court to pursue his unexhausted claims within 30 days of the entry of the order. (ECF No. 13).

### D. Second State Habeas Proceeding

Clement submitted a second state habeas petition in the Circuit Court which was entered on the docket in May 2016. (ECF No. 24-22).[5] In the petition, Clement asserted the grounds, which he had previously raised in his initial § 2254 federal habeas petition. (*Id.* at 2-5, 19-21). Clement alleged that Hoosier provided ineffective assistance of counsel during Clement's state habeas proceedings and that this ineffective assistance of counsel prevented Clement from effectively litigating his claims in the initial habeas proceeding. (*Id.* at 22-23).

---

[5] Clement asserts that he submitted a state habeas petition in the Circuit Court on December 3, 2015, which "[t]hrough a series of errors by the Circuit Court" was not entered until May 2016. (ECF No. 38 at 2-3). Clement submits a series of correspondence with Circuit Court employees in support of this assertion. (ECF No. 38-1 at 8-38).

On September 14, 2016, the Circuit Court entered an Order dismissing Clement's second habeas petition. (ECF No. 24-23 at 2). The Circuit Court concluded that "all of [Clement's] alleged 'unexhausted' claims have been either waived, or fully adjudicated on the merits, in the underlying habeas proceeding." (*Id.* at 19). The Circuit Court noted that Clement's initial habeas proceeding "presented a rather unique set of circumstances" due to the fact that Clement "continually second guesse[d] the legal proficiency of counsel and [chose] to proceed as if *pro se* by submitting his own documents for consideration," but that, nevertheless, "*all* of the claims raised in the filings, whether they were [Clement's] or [Hoosier's] work, *were fully addressed based upon the merit of the substantive ground raised either in the Losh list or in the multiple filings submitted in the matter.*" (*Id.* at 28). Although the Circuit Court believed it "highly irregular to have both a Petitioner and counsel filing independent documents," the Circuit Court fully addressed all claims raised in the initial habeas petition, and "did not in any way distinguish and disregard claims based upon who filed them." (*Id.*). Therefore, the Circuit Court concluded that, assuming *arguendo*, Clement established that the performance of Hoosier was defective, he was unable to show any prejudice stemming from this defective performance as his claims were fully considered and simply lacked merit. (*Id.* at 28-29).

On October 2, 2017, Clement submitted an appeal of the Circuit Court's dismissal of his petition to the WVSC. (ECF No. 24-24 at 56). Clement asserted the following assignments of error:

> 1. The [Circuit] Court erred in denying [Clement's] Second Habeas concerning Ineffective Habeas Counsel in order to sort out the mess that previous Habeas Counsel, ... Hoosier caused and without allowing [Clement] to amend or add any additional Grounds as requested due to the Federally imposed deadline of filing the Writ of Habeas Corpus denying [Clement]'s 5th, 6th , and 14th Constitutional Amendment Rights[;]

2. The [Circuit] Court erred in not allowing [Clement] to file additional claims as motioned. The [Circuit] Court did not rule on the Motion for Leave to File Additional Claims but rather denied the Writ of Habeas Corpus all together, thus denying [Clement] his Constitutional Rights of Due Process[;]

3. [Clement's] 5th, 6th and 14th Constitutional Amendment Rights have been violated by the [Circuit] Court, over Defense Objection, when it did not allow exculpatory evidence, in the form of audio and video recordings initially conducted by the WV Dept. of Health & Human Resources into trial and did not allow the jury to view and hear the interview recordings after it had been mentioned in testimony without objection by the State. Further, because of the [Circuit] Court's exclusion and the jury not viewing and hearing this crucial piece of evidence, [Clement] was denied a fair trial, an effective defense, and it resulted in a verdict based upon partial facts. The [Circuit] Court used WV Rules of Evidence mechanistically without evaluating whether the interest served by the rule justified the total limitation[;]

4. The [Circuit] Court erred in not requiring a new Jury pool in which two (2) excused jurors engaged in misconduct which denied [Clement] a fair trial. In addition, pursuant to the Prosecutor's remarks, there were jurors that had sat on a jury prior with the Prosecutor. One juror revealed the Prosecutor had represented them prior. A biased jury denies [Clement] a fair trial from the commencement of these proceedings violating [Clement's] 5th and 14th Constitutional Amendment Rights[;]

5. The Prosecutor withheld exculpatory evidence and also inflamed the jury by making false and misleading comments about [Clement], thus violating [Clement's] 5th and 14th Constitutional Rights of Due Process[;]

6. Sufficiency of Evidence violating [Clement's] 5th and 14th Constitutional Rights of Due Process[;]

7. Jury instructions were flawed, incomplete, misleading, and confusing, thus violating [Clement's] Constitutional Rights of Due Process of the Fourteenth Amendment[;]

8. Ineffective Assistance of Counsel violating [Clement's] 6th Constitutional Amendment Right:

a. Failure to Investigate.

b. Failing to object and request [Clement's] case be analyzed based upon the long[-]standing United States Supreme Court [case:] *Rock v. Arkansas* 483, U.S. 44 ... (1987) principles.

c. Failure to enter into Plea negotiations with the Prosecutor[;]

9. The [Circuit] Court erred by not dismissing the thirty-two (32) counts of Sexual Abuse by a Parent, Guardian or Custodian due to the FACT that the mother of the alleged victims testified [Clement] <u>WAS NOT</u> a parent, guardian or custodian[;]

10. The [WVSC] contravened [Clement's] Constitutional 5th and 14th Amendment Rights [to] Due Process by knowingly allowing ... Hoosier to submit a deplorable and atrocious Habeas Corpus Appeal that had so many errors that [Clement] tried to correct by submitting his own pro se petition but the [WVSC] would not consider it[;]

11. Ineffective Assistance of Habeas Counsel for failing to submit the correct information and errors before the Circuit Court and especially before the [WVSC] [which] violated [Clement's] Fifth, Sixth, and Fourteenth Constitutional Amendment Rights.

(ECF No. 24-24 at 6-7). In the brief, Clement included a new allegation that Howell concocted the accusations against Clement because he was "angry and disgruntled" at Clement as "he discovered that Mrs. Howell and [Clement] had been having an affair for approximately twelve (12) years." (*Id*. at 14). The State submitted a response requesting that the WVSC deny Clement's appeal and affirm the Circuit Court's order on November 17, 2017. (ECF No. 24-25 at 17-18). Clement entered a reply on December 5, 2017, arguing that Hoosier's deficient assistance of counsel deprived Clement of a fair hearing with respect to his first state habeas petition. (ECF No. 24-26 at 21-22).

On February 22, 2019, the WVSC denied Clement's appeal. (ECF No. 24-27 at 2). The WVSC concluded that the doctrine of *res judicata* applied to Clement's second habeas petition, and concurred with the Circuit Court's finding that "every issue that could be properly raised in a habeas proceeding was either waived or fully adjudicated in [Clement's] first such proceeding." (*Id*. at 7). The WVSC additionally agreed with the Circuit Court's "finding that given the entry of a comprehensive order in the prior proceeding that thoroughly addressed all of [Clement's] claims consistent with the record,

38

evidence presented, and relevant law, . . . regardless of what appellate argument was made
…, none of the claims raised on appeal would have warranted relief." (*Id.* at 8-9). The
WVSC denied Clement's petition for a rehearing on May 16, 2019. (ECF No. 24-28 at 2).

### E. Instant Proceedings

On August 2, 2019, Clement submitted the instant Amended Petition for a Writ of
Habeas Corpus under § 2254. (ECF No. 20). In the petition, Clement raises the following
claims:

1. The Circuit Court erred by not allowing into evidence exculpatory audio
and video recordings of prior interviews of the victims;

2. Two jurors "tainted the potential jury pool" by crying following
questioning in chambers regarding their ability to fairly judge a case which
involved sexual assault;

3. Prosecutorial misconduct based upon the prosecutor's comments during
trial and the prosecutor's withholding of the exculpatory evidence audio and
video recordings;

4. Insufficient evidence;

5. Circuit Court applied rules of evidence "mechanistically," depriving
Clement of the ability to present a fair defense, when it ruled that the audio
and video interview recordings were not admissible;

6. Improper jury instructions;

7. Ineffective assistance of counsel based upon:

a. Failure to object to statements made by the prosecutor;

b. Failure to retain medical expert testimony;

c. Failure to investigate;

d. Failure to request that Clement's case be analyzed under
applicable United States Supreme Court case law;

e. Failure to object to the Circuit Court's instruction regarding
Sexual Abuse by a Parent, Guardian, or Custodian;

f. Failure to object to the Circuit Court's "incomplete" instruction regarding the element of forcible compulsion;

g. Failure to object to the Circuit Court's violation of *ex post facto* principle;

h. Failure to object to the imposition of the sexual assault statute;

i. Failure to call witnesses who could impeach the victims' testimony;

j. Failure to subject the State's case to a meaningful adversarial process;

k. Failure to hire a forensic expert to discredit the State's case;

l. Failure to subpoena a minor victim's medical records;

m. Failure to investigate the school records of a victim;

n. Failure to call a witness who was a family friend of the victims' family;

o. Failure to request a limiting instruction on prior bad act evidence introduced at trial;

p. Failure to request a limiting instruction regarding the prosecutor's "inflammatory" statements;

q. Failure to communicate a plea offer.

8. actual innocence;

9. The Circuit Court erred by not dismissing the counts of sexual abuse by a parent guardian or custodian due to insufficient evidence;

10. Violation of Clement's constitutional rights due to ineffective performance by Hoosier in submitting the habeas appeal brief;

11. Violation of Clement's right to counsel due to Hoosier's ineffective assistance during habeas proceedings.

(ECF No. 20 at 7-21). Clement additionally submitted a contemporaneous motion requesting that the undersigned construe his petition liberally. (ECF No. 22). On August 6, 2019, the undersigned submitted an Order directing Respondent to answer Clement's

petition, and denying Clement's motion requesting liberal construction of his petition as liberal construction of *pro se* pleadings is already required by binding precedent and a motion requesting the same is not necessary. (ECF No. 23 at 1-2).

On October 4, 2019, Respondent supplied an Answer to Clement's Amended Petition as well as a Motion for Summary Judgment and accompanying Memorandum of Law in support. (ECF Nos. 24, 25, 26). Respondent argues in the memorandum that Clement is unable to proceed with his petition as the majority of the claims he seeks to raise are barred by an independent and adequate State rule of law, and the remainder, consisting solely of Clement's claims of ineffective assistance of trial counsel, are substantively meritless. (ECF No. 26 at 11, 13).

Following several requests for extension of time, (ECF Nos. 28, 33, 36,), Clement submitted a Reply to Respondent's request for summary judgment on March 16, 2020. (ECF No. 38). Clement believes that the WVSC did not adequately review his brief on appeal of the Circuit Court's order dismissing his second state habeas petition, but instead merely "took at face value what the Circuit Court said." (*Id.* at 6). Clement disputes at-length Respondent's assertion that the majority of his claims are procedurally barred, contending that the deficient performance provided by Hoosier requires his claims be examined on the merits. (*Id.* at 7-18). Clement further disputes Respondent's contention that his ineffective assistance of trial counsel claims lack merit, explicating the various ways in which Mullins failed to provide constitutionally sufficient counsel at trial. (*Id.* at 19-35). Clement asserts that he was unjustly convicted and requests that he either be appointed counsel and granted an evidentiary hearing, or be summarily granted relief from his convictions. (*Id.* at 37-38).

## II.    <u>Standards of Review</u>

Title 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, authorizes a federal district court to entertain a petition for habeas corpus relief from a prisoner in State custody, "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). When determining the merits of a § 2254 petition, the district court applies the standard set forth in § 2254(d), which provides that the habeas petition of a person in State custody "shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim" is:

(1) contrary to, or involves an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d)(1)–(2). Moreover, the factual determinations made by the state court are presumed to be correct and are only rebutted upon presentation of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). Thus, when reviewing a petition for habeas relief, the federal court uses a "highly deferential lens." *DeCastro v. Branker*, 642 F.3d 442, 449 (4th Cir. 2011).

A claim is generally considered to have been "adjudicated on the merits" when it is "substantively reviewed and finally determined as evidenced by the state court's issuance of a formal judgment or decree." *Thomas v. Davis*, 192 F.3d 445, 455 (4th Cir. 1999). The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have separate and independent meanings. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court

42

decision warrants habeas relief under the "contrary to" clause "if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to the Supreme Court's." *Lewis v. Wheeler*, 609 F.3d 291, 300 (4th Cir. 2010) (quoting *Williams*, 529 U.S. at 405) (internal quotations omitted). The district court may grant a habeas writ under the "unreasonable application" clause if the state court "identifies the correct governing legal rule from the [Supreme] Court's cases but unreasonably applies it to the facts of the particular case." *Id.* at 300–01 (internal marks omitted). Accordingly, the AEDPA limits the federal habeas court's scope of review to the reasonableness, rather than the correctness, of the state court's decision. A federal court may not issue a writ under this standard "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 365.

Here, Respondent moves for summary judgment. (ECF No. 25). Summary judgment under Rule 56 of the Federal Rules of Civil Procedure "applies to habeas proceedings." *Brandt v. Gooding*, 636 F.3d 124, 132 (4th Cir. 2011) (quoting *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991)). The court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] fact or facts are material if they constitute a legal defense, or if their existence or nonexistence might affect the result of the action, or if the resolution of the issue they raise is so essential that the party against whom it is decided cannot prevail." Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*: *Civil* § 2725 (3d ed. 2005). On the other hand,

a fact is not material when it is of no consequence to the outcome, or is irrelevant in light of the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Assertions of material facts must be supported by "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In addition, only genuine disputes over material facts "will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). A dispute is "genuine" when "there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party." *Cox v. Cty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001) (citing *Anderson*, 477 U.S. at 248).

Motions for summary judgment impose a heavy burden on the moving party, as it must be obvious that no material facts are in dispute and no rational trier of fact could find for the nonmoving party. *See Miller v. F.D.I.C.*, 906 F.2d 972, 974 (4th Cir. 1990). Nonetheless, the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent entry of summary judgment. *Anderson,* 477 U.S. at 252. While any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986), "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Anderson*, 477 U.S. at 249–50).

## III.  **Exhaustion**

Before a state prisoner can bring a § 2254 petition in federal district court, the

prisoner must first have "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). "The rule of exhaustion in federal habeas corpus actions is rooted in considerations of federal-state comity." *Preiser v. Rodriguez*, 411 U.S. 475, 491, (1973). In order to comply with the exhaustion requirement, a petitioner must have offered the state an adequate "opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal quotation omitted). While it is unnecessary to cite "book and verse on the federal constitution," the petitioner must first present the "substance of a federal habeas corpus claim" to the state courts. *Picard v. Connor*, 404 U.S. 270, 277-78 (1971). Thus, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (internal citations omitted). If the state court's opinion is ambiguous regarding whether the claim was rejected on the merits or on the basis of an independent state procedural rule, it should be presumed the claim was rejected on the merits. *Harris v. Reed*, 489 U.S. 255, 265 (1989). In West Virginia, prisoners may exhaust their available state court remedies either by stating cognizable federal constitutional claims in a direct appeal, or by stating such claims in a petition for a writ of habeas corpus in a state circuit court pursuant to West Virginia Code § 53–4A–1, and then appealing any adverse decision to the WVSC. *Moore v. Kirby*, 879 F. Supp. 592, 593 (S.D.W.Va.1995); *McDaniel v. Holland*, 631 F. Supp. at 1545.

Respondent argues that the majority of Clement's claims are unexhausted as he failed to raise them on appeal to the WVSC in his initial state habeas petition. (ECF No. 26 at 11-13). This argument is mistaken for a number of reasons. First, Respondent fails to realize that Clement raised claims 1, 2, 3, 4, and 5 on direct appeal. (ECF Nos. 24-9 at

11-12, 20 at 7, 9-11). This mistake is especially confounding as the undersigned noted that Respondent made the same error of overlooking Clement's direct appeal in the PF&R previously filed in this case. (ECF No. 12 at 16 n.11).

With respect to Clement's remaining claims, as detailed more fully below, they were all raised and addressed by the Circuit Court in Clement's initial habeas petition. In the PF&R previously filed in this case, the undersigned determined that there existed "a reasonable possibility" that the state courts would address Clement's, then unexhausted, claims on the merits if he returned to state court due to Clement's claim that Hoosier supplied ineffective assistance of habeas counsel. (ECF No. 12 at 18).

Clement returned to the state courts raising the same claims as he did in his initial habeas proceeding, and that he brings in this Court. (ECF No. 24-22 at 2-5, 19-21). The Circuit Court dismissed these claims, finding that all of Clement's claims had "been either waived, or fully adjudicated on the merits, in the underlying habeas proceeding." (ECF No. 24-23 at 19). The Circuit Court went on to explain that all of the claims Clement presented in his second habeas petition "*were fully addressed based upon the merit of the substantive ground raised either in the Losh list or in the multiple filings submitted in the matter.*" (*Id.* at 28). Accordingly, the Circuit Court determined that, assuming *arguendo*, Hoosier had provided constitutionally deficient performance, Clement was not entitled to relief as the claims had been fairly addressed on the merits and Clement was unable to show that the result would have been different absent Hoosier's ineffective assistance. (*Id.* at 28-29).

On appeal, the WVSC agreed with the Circuit Court's conclusion that all of Clement's claims had been "either waived or fully adjudicated" in his initial state habeas petition. (ECF No. 24-27 at 7). The WVSC specifically held that, "given the entry of a

comprehensive order in the prior proceeding that thoroughly addressed all of [Clement's] claims consistent with the record, evidence presented, and relevant law, ... regardless of what appellate argument was made ... none of the claims raised on appeal would have warranted relief." (*Id*. at 8-9) (internal quotation omitted).

When a state court has summarily denied a habeas claim without providing a reason for the dismissal, that decision can only be overturned if the petitioner shows that "there was no reasonable basis" for the state court's decision. *Cullen v. Pinholster*, 563 U.S. 170, 188 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 98, (2011)). However, when a state appellate court summarily affirms a lower court's reasoned denial of a petitioner's habeas claims, federal courts "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *see also Grueninger v. Dir., Virginia Dep't of Corr*., 813 F.3d 517, 525–26 (4th Cir. 2016) ("When a state appellate court summarily affirms a reasoned lower-court decision, or refuses a petition for review, then ... a federal habeas court is to 'look through' the unexplained affirmance to examine the 'last reasoned decision' on the claim, assuming that the summary appellate decision rests on the same ground.") (internal citation omitted). When confronting a state courts' summary affirmation of a lower court's reasoned decision, a federal court should "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. at 1192. However, this presumption can be overcome by the State if it shows that the unexplained affirmance likely rests on other grounds than those asserted in the lower court decision. *Id.*

Here, both the Circuit Court and the WVSC determined that Clement's ineffective assistance of habeas counsel claims were unavailing based on the Circuit Court's

comprehensive order dismissing his initial habeas petition. (ECF Nos. 24-23 at 28, 24-27 at 8-9). The state courts concluded that Clement was unable to demonstrate prejudice due to Hoosier's alleged failings on appeal because the Circuit Court's order comprehensively considered and rejected all of the claims which Clement sought to raise in his second habeas proceedings, and he had not shown that the claims would have fared better on appeal. (*Id.*). In effect, these decisions amounted to a summary affirmance of the Circuit Court's order dismissing Clement's first habeas petition, the "last reasoned decision" on a number of Clement's claims. *Grueninger*, 813 F.3d at 526.

While Respondent asserts that Clement is not able to raise these claims as they are unexhausted, the reasoning behind his assertion is not clear. Respondent faults Clement for failing to pursue his claims in the initial habeas proceeding, and states that it is Clement's "own fault that the state courts were deprived a meaningful opportunity to consider [Clement's] unexhausted grounds on their merits, and this Court should observe the waiver of those claims as an independent basis for denying federal collateral review." (ECF No. 26 at 13). This representation ignores the procedural history in this case, however, as Clement was ordered by this Court to return to the WVSC based on the reasonable probability that the state courts would allow Clement to raise the claims he failed to raise on appeal based on his assertion that it was due to ineffective assistance of habeas counsel. When confronted with this question, the WVSC found that the claims were barred by the doctrine of *res judicata*, essentially sidestepping the issue of whether Hoosier had provided defective performance, and finding instead that Clement failed to show any prejudice stemming from Hoosier's alleged failings as the Circuit Court's comprehensive order dismissing *all* of Clement's claims revealed that the claims lacked merit and would have failed on appeal. (ECF No. 24-27 at 8-9). As noted, this holding

48

amounted to a summary affirmation of the Circuit Court's initial order, and effectively rested on a determination that Clement's claims had already been adjudicated and lacked merit, rather than that they were procedurally defaulted. *See Harris*, 489 U.S. at 265; *Schmitt v. True*, 387 F. Supp. 2d 622, 633 (E.D. Va. 2005). In other words, while the WVSC did determine that Clement's claims were barred by the doctrine of *res judicata*, it did so not in the course of determining that the claims were waived, and thus subject to procedural default, but rather in determining that they were *already litigated* in the Circuit Court, and summarily affirming that decision. *See Green v. French*, 978 F. Supp. 242, 251 (E.D.N.C. 1997), *aff'd,* 143 F.3d 865 (4th Cir. 1998) (holding that a state court finding claim barred by *res judicata* as already litigated, did not amount to procedural default as it was effectively a finding that the claim was exhausted); *see also Moore v. Bryant*, 295 F.3d 771, 776 n.1 (7th Cir. 2002) ("[A] state court's invocation of *res judicata* simply means that the state courts have already resolved the matter and want nothing more to do with it.") (quotation omitted).

As the WVSC's determination resulted in a finding that Clement's claims had been fully and finally litigated in the initial Circuit Court order denying relief, and additionally amounted to a summary affirmation of that order, the undersigned **FINDS** that his claims are exhausted.

## IV.    <u>Discussion</u>

As noted above, Clement's § 2254 petition ostensibly asserts 11 grounds for relief, with his claim of ineffective assistance of counsel consisting of 17 sub-claims. A number of Clement's grounds for relief contain multiple independent claims. These claims will all be considered in turn. As the Circuit Court's order dismissing Clement's initial habeas petition amounts to the last reasoned decision on the majority of Clement's claims, the

undersigned will largely refer to that decision when considering the reasonableness of the state court determinations.

### 1. Exculpatory audio and video evidence

Clement argues that the Circuit Court erred by refusing to admit audio and video recordings of interviews of the minor victims conducted in the course of the investigation into the criminal charges against Clement. (ECF No. 20 at 7). Clement believes this ruling violated his right to a fair trial as it resulted "in a verdict based upon partial facts." (*Id.*). Clement asserts he wished to introduce the recordings in order to impeach the victims with prior inconsistent statements, "and to make obvious the deficiencies in the interview process." (*Id.*).

Clement states that the recorded interviews were initially recorded on Video Home System ("VHS") tapes and then transferred "by some unknown person(s)" onto two separate Compact Discs ("CDs") consisting of an audio and video depiction of the interviews. (*Id.*). Clement objects to the fact that the CDs were "never authenticated," and no chain of custody was provided. (*Id.*). Clement asserts that he should have been granted the opportunity to view the original VHS tapes and introduce them to the jury. (*Id.* at 7-8).

Clement raised this claim in his initial habeas petition, and the Circuit Court considered it at length. The Circuit Court noted that Clement wished to introduce the prior recorded statements in order to support his argument, as provided by Dr. Clayman, that the victims' testimony was rehearsed and coached. (ECF No. 24-17 at 77). The Circuit Court concluded that its decision to exclude the prior recorded statements was not an abuse of discretion because the statements made in the interviews were not inconsistent with the trial testimony and thus were not admissible under West Virginia evidentiary

rules. (*Id*. at 79). The Circuit Court further found that the victims testified, and Clement had the opportunity to question the victims regarding any differences between their trial testimony and statements made in the interviews and declined to do so, noting that "in all his numerous filings and pleadings in this matter, [Clement] has failed to identify *any* instance where the victims' trial testimony and their recorded statements diverge in *any* way..." (*Id*. at 80).

Instead, the Circuit Court took Clement's argument to be "that the victims' testimony was *too* consistent, so consistent that their testimony had to be the product of coaching." (*Id*.). The Circuit Court believed this resulted in Clement being "hoist with his own petard" as he could not demonstrate that the prior recorded interviews should have been introduced for impeachment purposes. (*Id*.). The Circuit Court concluded:

> If [Clement] believed that the victims' statements were coached, he had a golden opportunity to test that thesis at his trial. That is, after all, one of the primary reasons why the law required that he be allowed to confront and cross-examine the State's witnesses. If he chose to pass on that opportunity for strategic reasons and with the advice of competent counsel, that was his decision, and he must live with the consequences.

(ECF No. 24-17 at 80). Turning to Clement's claim that the Circuit Court erred in light of the Supreme Court of the United States ("Supreme Court") decision in *Rock v. Arkansas*, 483 U.S. 44 (1987), which admonishes against mechanistically applying evidentiary rules to the detriment of a defendant's ability to present a defense, the Circuit Court determined the exclusion of the interviews was appropriate. (*Id*. at 81-82). In support of this conclusion, the Circuit Court noted that the father of the victims could be heard laughing in the background of the tapes, and the Circuit Court "was concerned that the father's ill-timed laughter might prejudice the jury against the victims." (*Id*. at 82). The Circuit Court further found that the "defense would not have been enhanced in any material way if the

Recordings had been admitted" because Dr. Clayman was permitted to give an unchallenged expert opinion regarding the potential presence of coaching, and if the victims were coached into fabricating the story, Clement was granted the opportunity to challenge their testimony through cross-examination at trial. (*Id.* at 83-84). Clement raised the argument on appeal, and the WVSC likewise determined that the claim lacked merit for essentially the same reasons as cited by the Circuit Court. (ECF No. 24-21 at 8).

With respect to this claim, Clement challenges a state court evidentiary ruling. It is not "the province of a federal habeas court to reexamine state court determinations on state-law questions." *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991). When considering federal habeas corpus petitions involving state evidentiary rulings, federal courts "'do not sit to review the admissibility of evidence under state law unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding.'" *Harper v. Ballard*, No. CIV.A. 2:13-7421, 2015 WL 1431164, at *21 (S.D.W. Va. Mar. 27, 2015) (quoting *Burket v. Angelone*, 208 F.3d 172, 186 (4th Cir.2000)). "It is only in circumstances impugning fundamental fairness or infringing specific constitutional protections that a federal question is presented." *Id.* (quoting *Spencer v. Murray*, 5 F.3d 758, 762 (4th Cir.1993)).

Clement alleges that the state courts' determination the audio and video recordings were permissibly excluded from trial was in error as the exclusion denied him a fair trial. (ECF No. 20 at 7). A "defendant's 'right to due process guarantees the right to a fair opportunity to defend against the State's accusations ....'" *Smith v. Mirandy*, No. 2:14-CV-18928, 2016 WL 1274592, at *17 (S.D.W. Va. Mar. 31, 2016) (quoting *United States v. Jinwright*, 683 F.3d 471, 482–83 (4th Cir. 2012)). This right to present a defense is not unlimited, however, and is subject to certain restrictions. *Id.* (citing *United States v.*

*Scheffer*, 523 U.S. 303, 308 (1998)). "'A defendant's interest in presenting ... evidence may ... bow to accommodate other legitimate interests in the criminal trial process.'"" *Id.* Accordingly, the exclusion of evidence in pursuit of other legitimate interests will only violate the constitution if "the exclusion 'has infringed upon a weighty interest of the accused' or 'significantly undermined the fundamental elements of the defendant's defense.'" *Id.* quoting (*Scheffer*, 523 U.S. at 308, 315).

In the instant petition, Clement cites two defense strategies for which he wished to utilize the recorded prior interviews: (1) to "make obvious the deficiencies in the interview process"  and (2) to impeach the victims' testimony. (ECF No. 20 at 7).  Clement additionally alludes to a third objection he has to the recorded interviews, which he raises at various points throughout the pleadings, that they were improperly copied onto a different format. The undersigned will consider each argument.

*i.) Deficiencies in the interview process*

Clement does not elaborate on this assertion in the instant proceeding; however, the numerous briefs he filed regarding this issue in his state habeas proceedings make clear that he believes introduction of the recorded statements would have lent support to the claim, discussed by Dr. Clayman, that the victims were coached and had rehearsed their stories. (ECF No. 24-20 at 16-17). Clement assumes that the recorded videotape would substantiate his defense that the victims were coached because it would show that their  stories were "the same and rehearsed," and additionally "lacked detail." (ECF No. 24-24 at 29). According to Clement, the similarity between the victims' testimony in the recorded interviews, and that which they gave at trial, confirms they "were coached and rehearsed to obtain the statements desired and then regurgitated it in front of a jury." (*Id.* at 31).

The state court's determination that the exclusion of this evidence did not warrant a new trial was not so objectively erroneous that the decision should be overturned under the deferential standard of review mandated by the AEDPA. First, as noted by the state courts, Dr. Clayman was permitted to testify regarding his observation of the interview process, and gave his professional opinion that the fact the victims "both told the exact same story, using almost the exact same words," could potentially suggest coaching or rehearsing of the stories occurred. (ECF No. 24-30 at 102). Accordingly, Clement was permitted to present evidence, in the form of an expert opinion, with respect to his theory that the victims were coached in the interview process. He was not entirely denied the right to present this defense.

Second, and more fundamentally, the victims both testified at trial. Accordingly, the jury was able to judge, based on the victims' in-person testimony, whether their description of the events seemed coached or rehearsed. Clement was able to cross-examine the victims when they took the stand and could have used that opportunity to test whether the victims were able to withstand the scrutiny of searching cross-examination, a much more effective tool for revealing whether the victims were merely regurgitating a rehearsed story than resting on similarities between a recorded interview and testimony at trial. Clement's counsel chose not to do so, concluding that the potential benefit of aggressive cross-examination was outweighed by the potential harm, which was probable when considering the sympathy that jurors typically feel for minor victims. (ECF No. 24-31 at 58). Mullins believed that the best tactic was to limit the amount of time the minor children were on the stand. He was additionally concerned that extensive cross-examination would backfire by revealing further damaging details not disclosed during the relatively short direct examination. (*Id.*). This was a reasonable trial strategy. *See*

*Swafford v. Cartledge*, No. CA 5:12-3024-TMC, 2013 WL 5719075, at *5 (D.S.C. Oct. 21, 2013); *see also Chavez v. Uttecht*, No. C19-1033-JCC, 2020 WL 2113768, at *3 (W.D. Wash. May 4, 2020) ("Counsel's hesitation and ultimate choice to 'punt cross examination' does not display ineffective assistance of counsel, but rather a thoughtful approach to effectively crossing a sympathetic and young victim."); *U.S. ex rel. Hawthorne v. Cowan*, 224 F. Supp. 2d 1178, 1194 (N.D. Ill. 2002) ("[T]he court finds that it was a reasonable decision of trial strategy for [counsel] to avoid over aggressively cross examining a victim in order to avoid appearing belligerent and unsympathetic before the jury."); *Roseboro v. State*, 317 S.C. 292, 294, (1995) (finding that when trial counsel articulates a valid reason for employing a certain strategy, such conduct should not be deemed ineffective assistance of counsel).

Accordingly, given that both victims testified at trial and were subject to cross examination, and given that the Circuit Court permitted Clement to present expert testimony regarding the theory that the victims may have been coached, the decision to exclude the prior recorded interviews did not "significantly undermine[] the fundamental elements of [Clement's] defense." *Scheffer*, 523 U.S. at 308, 315. Likewise, the Circuit Court's evidentiary ruling was not "so extreme as to result in a denial of a constitutionally fair proceeding." *Burket*, 208 F.3d at 186. The fact that Clement's counsel made a tactical decision not to support his theory that the victims' stories were coached through aggressive cross-examination does not meant that he was effectively prevented from making this defense. Accordingly, the undersigned **FINDS** that the state courts' determination that this claim lacked merit was neither an unreasonable application of, nor contrary to, clearly established federal law.

*ii.) Prior inconsistent statements*

Clement additionally states that he wished to use the prior recorded interviews for impeachment purposes. (ECF No. 20 at 7). Yet, Clement does not identify any specific inconsistent statements. Notably, this claim is at odds with Clement's other asserted reason for wishing to introduce the recorded interviews, to reveal that the victims' stories and prior statements were *so* consistent they must have been the product of rehearsal and coaching.

In its order dismissing this claim, the Circuit Court noted that Clement had failed to identify any inconsistencies between the victims statements at trial and those given in the interviews. (ECF No. 24-17 at 80). The undersigned was likewise unable to find any allegation regarding specific inconsistent statements either in Clement's filings in this Court, or throughout the voluminous pleadings generated by Clement on this issue in the state courts. In the course of a discussion regarding the admission of the recorded interviews during Clement's trial, Mullins identified one example of an inconsistent statement. He indicated that there were allegations made during the interviews regarding assaults which allegedly took place in automobiles, but these assaults were never mentioned at trial. (ECF No. 24-30 at 5-6). Mullins also pointed out that Howell could be heard laughing on the audio recording, which was as inconsistent with his statement that he merely waited outside during the interview and did not participate. (*Id.* at 6).

As noted by the Circuit Court, the fact that events described in the interviews were not repeated at trial testimony does not necessarily reflect an inconsistency. (*Id.* at 8-9). If the victims had stated in the interview that Clement *only* sexually abused them in an automobile, while testifying at trial that he abused them at his residence, then this would reveal inconsistency, but merely describing an additional instance or instances of abuse

which took place in an automobile is not evidence of varying or inconsistent testimony. Furthermore, the Circuit Court informed Mullins that he could call the minor children back to the stand, if he wanted, in order to revisit and develop this issue further. (*Id.* at 11-12). In accordance with his stated belief that the best trial strategy was to minimize the time the minor victims spent in front of the jury, Mullins ultimately did not recall the victims. As noted above, this was a reasonable trial strategy. Furthermore, the potential downside to eliciting details regarding additional sexual assaults not described in the victims' initial testimony is obvious.

As to Mullins's assertion that Howell's audible laughter during the recorded interviews was inconsistent with his trial testimony, the Circuit Court correctly noted that Howell's laughter in the background of the audio recording was consistent with his testimony that he waited in an adjoining room. (ECF No. 24-30 at 9). As Clement has not identified any relevant inconsistencies between the statements made by the victims during the recorded interviews and those made at trial, he cannot show that his inability to use the recorded interviews to impeach the testimony of the victims resulted in a deprivation "so extreme as to result in a denial of a constitutionally fair proceeding." *Burket*, 208 F.3d at 186. Accordingly, the undersigned **FINDS** that the state courts' evidentiary ruling on this matter was not so objectively unreasonable that it should be overturned.

### iii.) Failure to authenticate

Clement states that the recorded interviews of the victims were originally copied onto VHS tapes and then later transcribed "by unknown persons" onto two separate CDs containing audio and video depictions of the interviews. (ECF No. 20 at 7). Clement objects that the CDs were "never authenticated as to who copied them or the chain of

custody they were in before trial," and they were of extremely poor quality. (*Id.* at 7-8). He alleges that he should have been provided with the original VHS tapes; particularly, given the substandard quality of the CDs.

While Clement's claim is not entirely clear, he appears to argue that the format in which he was provided the recorded videotapes amounted to a suppression of exculpatory evidence. Under the rule announced in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), a prosecutor may not withhold materially exculpatory evidence from the accused. "[A] *Brady* violation has three essential elements: (1) the evidence must be favorable to the accused; (2) it must have been suppressed by the government, either willfully or inadvertently; and (3) the suppression must have been material, *i.e.*, it must have prejudiced the defense at trial." *Monroe v. Angelone*, 323 F.3d 286, 299 (4th Cir. 2003).

Clement does not present any facts to demonstrate that exculpatory evidence was suppressed, or that the CD version of the interviews varied significantly from the VHS recordings. Instead, Clement merely concludes that converting the VHS tapes to a CD format was, in some way, nefarious and harmed his ability to use favorable evidence. Clement's position is based entirely upon speculation. Clement is unable to demonstrate that the conversion to CD resulted in material alterations to the recorded interviews, or even that the quality of the CDs was inferior to the quality of the VHS tapes. Moreover, the recorded interviews were ruled to be inadmissible at trial, not because of the format in which they were presented, but because of the content of the recorded interviews. A conviction should be overturned under *Brady* "only where there exists a reasonable probability that had the evidence been disclosed the result at trial would have been different." *Wood v. Bartholomew*, 516 U.S. 1, 5, (1995).

The Circuit Court reviewed the CDs and expressed no difficulty in making a

determination as to their admissibility based on either the quality or the content of the recordings. As the recorded interviews were not introduced into evidence, the State was not obligated to authenticate them or establish the chain of custody. Furthermore, as the exclusion of the recorded interviews was based on a rule of evidence, and not on the quality of the recording, Clement cannot demonstrate that had he been provided the recorded interviews in VHS format rather than in CD format, the result at trial would have been different. Therefore, the undersigned **FINDS** this claim to be unavailing.

As the state courts committed no error subject to reversal under the governing standard in excluding this evidence, the undersigned further **FINDS** that Respondent's request for summary judgment should be granted as to this claim.

### 2. Juror misconduct

Clement alleges that his right to a fair trial was violated when two jurors, who were excused for cause, engaged in "misconduct" by crying after being questioned *in camera* regarding their experience with sexual abuse. (ECF No. 20 at 9). Clement asserts that the excused jurors were observed crying as they exited the courtroom which "tainted the potential jury pool" and resulted in a prejudiced jury. (*Id.*). In the supporting facts section of the petition, Clement alleges that in addition to crying, the jurors were "making remarks" which tainted the jury pool. (*Id.*). Clement does not specify the content of these alleged remarks.

Clement raised this issue in his direct appeal, (ECF No. 24-9 at 11-12), which was summarily denied by the WVSC. (ECF No. 24-10 at 2). The Circuit Court additionally briefly considered this claim as raised in Clement's initial state habeas petition. (ECF No. 24-17 at 109). The Circuit Court began by noting that the claim was waived by Clement's failure to include it in his *Losh* list, but went on to deny the claim on the merits, noting

that the jurors were questioned *in camera,* outside the presence of the other potential jurors. The Circuit Court added that it was "at a loss" as to how the fact that two jurors cried while exiting the courthouse would prejudice the entire pool against Clement. (*Id.*).

The trial transcript reveals that a total of four prospective jurors were questioned privately *in camera* regarding their prior experience with sexual abuse. (ECF No. 24-29 at 39-52). Of the jurors questioned, three were excused for cause after expressing doubt that they could judge the case fairly. (*Id.*). The record does not describe the emotional state of the jurors as they exited the courthouse.

The Sixth Amendment right to jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). "Even if 'only one juror is unduly biased or prejudiced,' the defendant is denied his constitutional right to an impartial jury." *United States v. Eubanks*, 591 F.2d 513, 517 (9th Cir.1979). Due process requires that the defendant be tried by a jury capable and willing to decide the case solely on the evidence before it. *Smith v. Phillips*, 455 U.S. 209, 217 (1982).

"The essential function of *voir dire* is to allow for the impaneling of a fair and impartial jury through questions which permit the intelligent exercise of challenges by counsel...." *United States v. Brown*, 799 F.2d 134, 135–36 (4th Cir.1986). Absent evidence to the contrary, jurors are presumed to be impartial. *Poynter v. Ratcliff*, 874 F.2d 219, 221 (4th Cir.1989). The defendant bears the burden of overcoming this presumption by showing a concrete possibility of juror bias. *Wells v. Murray*, 831 F.2d 468, 472 (4th Cir.1987). "The bias of a prospective juror may be actual or implied; that is, it may be bias in fact, or bias conclusively presumed as [a] matter of law." *Conway v. Polk*, 453 F.3d 567, 586 (4th Cir.2006) (citation omitted).

Clement cites to no case law which supports his claim that bias should be presumed due to the fact that the jury pool observed two potential jurors crying after they were questioned privately *in camera*. While Clement currently alleges that the jurors made prejudicial "remarks" as they exited the courthouse, he does not describe the content of these remarks or explain how they prejudiced the jury pool. Nothing in the record reflects that the jurors made statements as they exited the courthouse, and Clement did not allege that the jurors made any statements when he first raised this claim in the state courts. (ECF Nos. 24-9 at 17-18). Indeed, neither party suggested at the time that the juror pool may have been contaminated by the actions of the excused jurors.

Clement additionally fails to demonstrate that the state courts acted in contravention of federal law by denying this claim. *See United States v. Wilson*, 565 F.3d 1059, 1069 (8th Cir. 2009) (no constitutional violation after four prospective jurors began crying during *voir dire* in response to a graphic tale presented by a different prospective juror about a personal experience with sexual abuse). Clement again identifies no case law supporting his argument that the presumption of impartiality which attaches to jurors should be overcome based on the potential jurors witnessing two jurors crying after *in camera* questioning. Clement provides only conclusory statements that the prospective jurors became prejudiced against him, and nothing in the record supports the conclusion that this incident caused such a reaction. Accordingly, the undersigned **FINDS** that the state courts' dismissal of this claim was neither contrary to, nor an unreasonable application of, federal law, and this claim should be summarily dismissed.

### 3. Prosecutorial misconduct

Clement alleges that his right to a fair trial was violated by prosecutorial misconduct. Specifically, Clement states that the prosecutor used "inflammatory"

language by referring to Clement as a "molester" and made false and misleading comments. (ECF No. 20 at 10). Additionally, Clement argues the prosecutor wrongfully withheld exculpatory evidence by not disclosing the "original videotape." (*Id*.).

### i.) Inflammatory language

Clement believes he was denied a fair trial because the prosecutor referred to him as a "molester" at trial. Clement does not state when this occurred, provide a citation to the record, or give any further details regarding the incident. The undersigned was able to locate one instance in which a prosecutor for the State used the term "molest." In closing arguments, Ms. Hewitt asked the jury to consider reasons why the victims may have not immediately reported Clement's behavior and remained silent for over a year, noting that children often believe they must follow rules established by adults or risk punishment. (ECF No. 24-30 at 215-16). In the course of doing so, Ms. Hewitt stated that it was "a long period of time that they were being molested by that man. They didn't say anything. They kept it a secret. If you apply that same logic, it's because, and I submit to you, maybe they thought they would get in trouble, too." (*Id*. at 216). Presumably, this remark is the statement to which Clement objects to as improperly inflammatory.

The Circuit Court considered this argument and concluded that, assuming the comment was inappropriate, Clement was not entitled to relief as the single comment made by Ms. Hewitt that the victims were "molested" by Clement did not deprive him of a fair trial. (ECF No. 24-17 at 93-94). The Circuit Court determined that Clement was not "materially prejudiced" by the statement as it was not based on a misrepresentation of the evidence; the remark was isolated; it did not appear to be a deliberate attempt to inflame the jury; and the evidence arrayed against Clement was strong. (*Id*. at 94-95).

A prosecutor's closing argument must be carefully tailored so as not to appeal to

the personal biases of the jury. *State v. Copeland*, 321 S.C. 318, 324 (1996). The State must confine its closing arguments to evidence in the record, and the reasonable inferences which it supports. *Id.* "A solicitor has a right to state his version of the testimony and to comment on the weight to be given such testimony." *Randall v. State*, 356 S.C. 639, 642 (2004). The proper inquiry when a petitioner alleges that a prosecutor's comments violated the due process guarantee provided by the Constitution is not whether the prosecutor's remarks were objectionable, but whether the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). In order to establish that statements made by a prosecutor violated a defendant's due process rights, the defendant must show both "(1) that the government's remarks were in fact improper and (2) that the remarks 'prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial.'" *United States v. Higgs*, 353 F.3d 281, 330 (4th Cir.2003) (quoting *United States v. Mitchell*, 1 F.3d 235, 240 (4th Cir.1993)). The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") has held that:

> [G]reat latitude is accorded counsel in presenting closing arguments to a jury. In our adversary system, prosecutors are permitted to try their cases with earnestness and vigor, and the jury is entrusted within reason to resolve heated clashes of competing views.... To be sure, there are some lines that prosecutors may not cross. But to parse through a prosecutor's closing statement for minor infelicities loses sight of the function of our adversary system, which is to engage opposing views in a vigorous manner.

*United States v. Runyon*, 707 F.3d 475, 507 (4th Cir. 2013) (quoting *United States v. Johnson*, 587 F.3d 625, 632–33 (4th Cir.2009). Accordingly, "while courts should not hesitate to condemn those prosecutorial comments that truly offend constitutional norms," courts should avoid attaching "constitutional significance to every verbal fillip, lest we unduly censor the clash of viewpoints that is essential to adversarial proceedings."

*Id.* Factors to be considered in evaluating prejudice are:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

*Mitchell*, 1 F.3d 235 at 241 (internal quotation marks omitted).

The Circuit Court correctly identified and considered the relevant factors, ultimately concluding that Clement failed to show the comment resulted in an unfair trial. (ECF No. 24-17 at 93-95). This conclusion was not unreasonable. The challenged remark, a single statement that Clement "molested" the victims, was not unsupported by reasonable inference based on the evidence introduced at trial, but instead supported by the direct testimony of the two minor victims. Moreover, the statement was isolated, consisting of a single remark made during the course of a lengthy trial in which multiple witnesses testified. Absent the remark, the evidence against Clement was substantial, consisting of testimony from two minor children that Clement had repeatedly sexually violated them, and medical expert testimony which revealed the victims displayed trauma consistent with sexual abuse. Finally, in view of the isolated nature of the remark, and that fact that it did not improperly mischaracterize evidence or refer to evidence not introduced, there is no indication that Ms. Hewitt used the phrase "molested" in a deliberate attempt "to divert attention to extraneous matters." *Mitchell*, 1 F.3d 235 at 241. Courts have not hesitated to find that similar isolated comments have not so prejudiced a defendant such as to result in a fundamentally unfair trial. *See Parker v. Warden, Broad River Corr. Inst.*, No. CV51504648TLWKDW, 2016 WL 7852482, at *38-39 (D.S.C. Nov. 3, 2016), *report and recommendation adopted*, No. 5:15-CV-04648-TLW, 2017 WL

227997 (D.S.C. Jan. 19, 2017) (prosecutor's remark in closing statement that petitioner was "a predator, a child molester," did not entitle petitioner to new trial as remark was unlikely to change outcome and statement was reasonably drawn from evidence); *see also Quinones v. Rubenstein*, No. CIV.A. 5:06-CV-00072, 2009 WL 899428, at *36 (S.D.W. Va. Mar. 26, 2009) (statements by prosecutor regarding defendant's guilt were not unduly prejudicial where based on reasonable inferences from evidence); *Gilchrist v. Hagan*, No. CA 606-1236-MBS, 2007 WL 951749, at *28 (D.S.C. Mar. 27, 2007) (statement by prosecutor that defendant "took away the daddy of these two small children" "over an argument about a parking space" did not violate due process when supported by record at trial).

Given the brief nature of the remark, and the fact that it was supported by substantial evidence presented at trial, it was not unreasonable for the state courts to conclude that Clement's trial was not rendered fundamentally unfair. Accordingly, the undersigned **FINDS** that Clement cannot succeed on this claim.

### ii.) Failure to provide exculpatory evidence

The undersigned has already considered Clement's claim that the "original" VHS videotape of the prior recorded interviews was wrongfully withheld, and concluded that this claim lacks merit. Accordingly, the undersigned **FINDS** that this claim, which rests on the identical allegation, should also be dismissed.

### 4. Sufficiency of the evidence

Clement alleges that his convictions should be overturned because they were not founded on sufficient evidence. (ECF No. 20 at 11). In support of this claim, Clement emphasizes that the "only evidence was testimony," and argues that if the "true evidence," the videotaped interviews, had been introduced at trial, "it would have shown the

coaching and conspiracy against [Clement]." (*Id.*). Clement believes that the lack of evidence deprived him of his constitutional right to a fair trial. (*Id.*).

Clement challenged the sufficiency of the evidence on direct appeal, and this argument was rejected in the WVSC's summary denial. (ECF Nos. 24-9 at 12, 24-10 at 2). The Circuit Court likewise considered and rejected this argument as raised in Clement's first state habeas petition, finding that the convictions "were based on legally sufficient evidence." (ECF No. 24-17 at 98).

"[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *Jackson v. Virginia,* 443 U.S. 307, 315 (1979) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). "To determine whether this due process right has been violated, the appropriate inquiry before the passage of AEDPA was a straightforward question of whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Now, under the AEDPA ... we inquire whether a state court determination that the evidence was sufficient to support a conviction was an objectively unreasonable application of [the standard enunciated in] *Jackson*." *Williams v. Ozmint*, 494 F.3d 478, 489 (4th Cir. 2007) (internal citations and quotations omitted). Thus, under this "twice-deferential standard," in order to conclude that a state court sufficiency of the evidence opinion was erroneous, a court must conclude both that no rational trier of fact could have found the defendant guilty *and* that there is no grounds for reasonable disagreement with respect to this conclusion. *Parker v. Matthews*, 567 U.S. 37, 43 (2012).

Clement has failed to meet this demanding standard. Clement's assertion that his

constitutional rights were violated by the Circuit Court's decision to deny the admission of the recorded videotaped interviews has already been considered by the undersigned and rejected.  Reconstituting this argument as an attack on the sufficiency of the evidence does not change the undersigned's conclusion that Clement's right to a fair trial was not violated by the exclusion of that evidence.

Clement additionally objects to the fact that only testimonial evidence was presented at trial. (ECF No. 20 at 11). However, a conviction may rest solely on testimonial evidence. *See e.g. Ault v. Waid*, 654 F. Supp. 2d 465, 494 (N.D.W. Va. 2009), *aff'd*, 414 F. App'x 546 (4th Cir. 2011) (state courts did not incorrectly apply federal law in concluding that testimony of minor victim standing alone was sufficient for conviction). When reviewing a claim for the sufficiency of the evidence,  the Government is given "the benefit of all reasonable inferences from the facts proven to those sought to be established." *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir.1982).

At trial, the two minor victims testified that Clement sexually abused them at least once a month during the time period charged in the indictment. Treating medical experts testified that the minor victims exhibited psychological traits consistent with having experienced sexual abuse. Clement took the stand and denied the allegations. Additionally, through the presentation of witnesses and argument by defense counsel, Clement attempted to convince the jury the allegations were manufactured by Howell due to resentment against Clement based on his interference in Howell's marriage.

When considering whether a conviction is supported by sufficient evidence, "[t]he jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented." *United States v. Ath*, 951 F.3d 179, 185 (4th Cir. 2020) (quoting *United States v. Palacios*, 677 F.3d 234, 250 (4th Cir. 2012)). In this case,

the jury was presented with testimony from the minor victims asserting that Clement had sexually abused them, and testimony from Clement that he did not. The jury resolved this dispute against Clement, believing the testimony of the minor victims, and disbelieving Clement's denial. Clement's argument that there was constitutionally insufficient evidence for conviction is not persuasive as he not shown that *no* trier or fact could rationally conclude that the two minor victims were telling the truth when they said Clement sexually abused them. Clement has pointed to no credible evidence that contradicts the testimony of the victims, or renders their testimony inherently incredible. *See Lucas v. McBride,* 505 F. Supp. 2d 329, 358 (N.D.W. Va. 2007) ("The key issues in this case were whether or not the jury believed that G.V. had been sexually assaulted and whether or not the petitioner was the perpetrator of that act. The issues raised by the petitioner in his petition to support his claim that there is insufficient evidence to support his conviction are all related to the credibility of the witnesses and the weighing of evidence. Those are issues that were resolved by the jury at trial and are not within the province of federal habeas review."); *Jones v. Seifert*, 808 F. Supp. 2d 900, 924 (S.D.W. Va. 2011) (dismissing sufficiency of evidence claim based on argument that victims' testimony was false as jury rejected this claim by finding the defendant guilty).

Finding in favor for Clement on this ground would involve both substituting the jury's credibility determination for one conducted by this Court, and concluding that the state courts' dismissal of this claim was objectively unreasonable, neither of which is appropriate in this case. Accordingly, the undersigned **FINDS** that this claim is subject to dismissal as the state courts' determination that there was sufficient evidence presented at trial to sustain the convictions was neither objectively unreasonable, nor contrary to federal law.

### 5. Right to present a defense

Clement argues that his ability to present an effective defense was unconstitutionally impeded by the Circuit Court's refusal to introduce the prior recorded interviews of the minor victims into evidence. (ECF No. 20 at 12). Clement believes the Circuit Court applied West Virginia evidentiary rules rigidly and "mechanistically" without properly weighing the effect it would have on his ability to present a defense. (*Id.*). Clement argues that because Dr. Clayman testified the victims were coached, and the jury later asked if it could view the recorded interviews, his right to a fair trial was denied.[6] (*Id.* at 12-13).

This is simply a reformulation of Clement's first claim that the Circuit Court's decision to exclude this evidence violated his constitutional right to a fair trial. (*Id.* at 7). As the undersigned has already extensively considered this claim and concluded that the Circuit Court's exclusion of this evidence was not so improper so as to effectively deny Clement a fair trial, the undersigned **FINDS** that this claim is also subject to summary judgment.

### 6. Jury instructions were misleading

Clement asserts that the jury instructions were improper as the Circuit Court failed to include elements of the crime. (ECF No. 20 at 14). Specifically, Clement asserts that the Circuit Court failed to specify "to the jury what particular kind of sexual contact." (*Id.*). Clement believes that if this had been done, the jury would have found him not guilty on

---

[6] Clement frequently asserts throughout his pleadings that Dr. Clayman testified it was his opinion that the victims were coached. This is inaccurate, however, as Dr. Clayman never stated he believed the victims were coached. Instead, he suggested that some aspects of the interview process did not comply with best practices in the field, and the fact that the victims' stories were simple, similar, and consistent, could suggest that the victims were coached and had rehearsed the narrative. (ECF No. 24-30 at 102-04). However, Dr. Clayman also noted that this could simply mean that the events happened as described. (*Id.*).

multiple counts. (*Id.*).

It is difficult to discern exactly what Clement is arguing under this ground. Gleaning insight from pleadings Clement submitted in the state courts, it appears that he is arguing the jury instructions regarding the offense of sexual abuse by a parent, guardian, or custodian, were incomplete, as the instructions failed to specify what "sexual contact" constituted the offense. (ECF No. 24-13 at 31-32). Clement was convicted under West Virginia Code § 61–8D–5, which provides in relevant part that:

> [A]ny parent, guardian or custodian of or other person in a position of trust in relation to a child under his or her care, custody or control, shall engage in or attempt to engage in sexual exploitation of, or in sexual intercourse, sexual intrusion or sexual contact with, a child under his or her care, custody or control, notwithstanding the fact that the child may have willingly participated in such conduct, or the fact that the child may have consented to such conduct or the fact that the child may have suffered no apparent ... injury as a result of such conduct, then such parent, guardian, custodian or person in a position of trust shall be guilty of a felony[.]

W. Va. Code § 61-8D-5(a). "Sexual Contact" is further defined as:

> [A]ny intentional touching, either directly or through clothing, of the breasts, buttocks, anus or any part of the sex organs of another person, or intentional touching of any part of another person's body by the actor's sex organs, where the victim is not married to the actor and the touching is done for the purpose of gratifying the sexual desire of either party.

W. Va. Code § 61-8D-1(9); W. Va. Code§ 61-8B-1(6). The Circuit Court considered this argument, characterizing it as a claim that the jury instructions were insufficient because they "failed to specify for the jury what *particular kind* of 'sexual contact' the jurors needed to find that [Clement] had committed." (ECF No. 24-17 at 85). The Circuit Court concluded that Clement's argument lacked merit as the instructions appropriately outlined all the essential elements of the crime. (*Id.* at 86). It was sufficient, the Circuit Court determined, to define the term "sexual contact" for the jury, and inform the jury that in order to convict Clement of custodial sex abuse it must find that he initiated sexual

70

contact with the minor victims. It was unnecessary to "spell out for the jury what 'sexual contact' might have meant in [Clement's] case." (*Id.*).

State court jury instructions are "matters of state law and procedure not involving federal constitutional issues, and are therefore not reviewable in a federal habeas proceeding." *Nickerson v. Lee*, 971 F.2d 1125, 1137 (4th Cir. 1992) (internal quotations omitted), *abrogated on other grounds by Yeatts v. Angelone*, 166 F.3d 255 (4th Cir. 1999). "A 'federal court may grant habeas relief only when the challenged instruction by itself so infected the entire trial that the resulting conviction violates due process, it is not enough that the instruction was undesirable, erroneous, or even universally condemned.'" *Smith v. Mirandy*, No. 2:14-CV-18928, 2016 WL 1274592, at *26 (S.D.W. Va. Mar. 31, 2016) (quoting *Nickerson*, 971 F.2d at 1137). "In determining whether a jury instruction, or lack of one, violated a defendant's due process rights, a reviewing court must make its determination in the context of the instructions as a whole and the trial record." *Blankenship v. Mitchell*, No. 1:05CV83-1-MU, 2006 WL 163619, at *3 (W.D.N.C. Jan. 20, 2006) (citation omitted).

Clement alleges that the jury instructions relating to the charges of sexual abuse by a custodian were invalid because they failed to set out specifically the conduct that could constitute the necessary element of sexual contact. (ECF No. 20 at 14). In instructing the jury on this charge, the Circuit Court stated that "[s]exual abuse by a custodian, a felony, is committed when any custodian of a child under his care, custody or control engages in or attempts to engage in sexual contact with the child under his care, custody or control..." (ECF No. 24-30 at 205). The instructions further provided definitions of key terms, defining "sexual contact" as:

71

> [A]ny intentional touching, either directly or through the clothing, of the anus or any part of the sex organs of another person or the breasts of a female or intentional touching of any part of another person's body by the actor's sex organs, where the victim is not married to the actor and the touching is done for the purpose of gratifying the sexual desire of either party.

(ECF No. 24-30 at 206). The Circuit Court instructed the jury that in order to find Clement guilty of these charges it must find:

> First, that [Clement] ... was the custodian of [A.S.H.]; and,
>
> Second, that [A.S.H.] was under the care, custody and control of [Clement]; and,
>
> Third, while [A.S.H.] was under the care, custody and control of [Clement], that [Clement] engaged in sexual contact with [A.S.H. ]; and,
>
> Fourth, that [Clement] engaged in such sexual contact with [A.S.H.] when she was a child; and,
>
> Fifth, that [Clement] engaged in such sexual contact with [A.S.H.] in Fayette County, West Virginia.

(*Id.* at 206-07). These instructions were repeated with respect to the identical charges involving A.C.H. (*Id.* at 208-10). The jury instructions on this charge largely tracked the statutory language. Federal law "places an especially heavy burden on a defendant who ... seeks to show constitutional error from a jury instruction that quotes a state statute." *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009) (quotation omitted). In order to prevail on such a claim, "the defendant must show both that the instruction was ambiguous and that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Id.* at 190-91 (quotations omitted).

Jury instructions must correctly identify all the necessary elements of the charged offense, and must correctly describe the defendant's potential defenses. *See United States*

*v. McFadden*, 823 F.3d 217, 224 (4th Cir. 2016); *United States v. Minor*, 498 F. App'x 278, 282 (4th Cir. 2012). In this case, the Circuit Court identified and defined all the necessary elements of the crime. (ECF No. 24-30 at 205-10). Clement objects to the fact that the specific conduct he could be found to have engaged in was not included in the instructions defining sexual contact. However, he has pointed to no law establishing that this is required. The testimony of the minor victims clearly described conduct which could constitute "sexual contact" as defined in the statute and provided in the jury instructions. The Circuit Court was not required to spell out for the jury what conduct, as described by the testimony of the minor victims, could constitute sexual contact, and the instructions, which provided the relevant legal definition and instructed the jury it must find Clement engaged in sexual contact in order to find him guilty of this crime, were not constitutionally deficient.

As Clement has not identified any legal error, much less one that created a "reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt," *Sarausad*, 555 U.S. at 190-91, the undersigned **FINDS** that the state courts' dismissal of this claim was not objectively unreasonable, and that Respondent's motion for summary judgment should thus be granted.

### 7. Ineffective Assistance of Counsel

Clement asserts 17 separate claims of ineffective assistance of counsel. These claims largely consist of terse conclusory statements. Mindful of Clement's status as a *pro se* litigant, the undersigned will attempt to fairly ascertain the specific claim being raised by Clement in each instance.

The Sixth Amendment to the United States Constitution guarantees a criminal

defendant "the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). While "assistance which is ineffective in preserving fairness does not meet the constitutional mandate ... defects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation." *Mickens v. Taylor*, 535 U.S. 162, 166 (2001). To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687–88, 694. When reviewing counsel's performance, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Moreover, counsel's performance should be assessed with "a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time," and a court should not allow hindsight to alter its review. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003). In addition, trial strategy devised after investigating the law and facts is "virtually unchallengeable." *Bell v. Evatt*, 72 F.3d 421, 429 (4th Cir. 1995).

As Clement is raising his claims of ineffective assistance of counsel in a § 2254 petition, his claims must overcome both the *Strickland* standard, and the barrier to review imposed by § 2254(d), resulting in review that is "doubly" deferential to the decision of the state court. *Knowles v. Mirzayance*, 556 U.S. 111, 129 (2009). In *Harrington v. Richter*, the Supreme Court made clear that relief in these circumstances should be granted only sparingly. 562 U.S. 86, 102 (2011). In *Harrington,* the Supreme Court reviewed and reversed a decision by the Ninth Circuit to grant relief to a petitioner raising ineffective assistance of counsel claims in a § 2254 petition. *Id.* The *Harrington*

Court clarified that the "pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Id.* at 101. A state court's determination that trial counsel was not defective cannot be overturned in federal habeas review unless "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. This is because for the "purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'" *Id.* at 101 (quoting *Williams,* 529 U.S. at 410). "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102. Habeas review under § 2254(d) is intended to function as a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102-03.

Likewise, "[s]urmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Harrington*, 562 U.S. at 105. It is not enough that trial counsel's performance may have "deviated from best practices or most common custom" as "the question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms.'" *Strickland*, 466 U.S., at 690. Thus, "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult," and "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington,* 562 U.S. at 102, 105. To succeed in establishing his claim of ineffective assistance of counsel, Clement must contend with this demanding standard articulated by the Supreme Court.

### a. Counsel failed to object to misleading and inflammatory statements

Clement provides more detail regarding this claim in his Reply, alleging that the prosecutor used inflammatory language in closing argument by referring to Clement as a "molester." (ECF No. 38 at 20-21). Clement additionally argues the prosecutor improperly asked the jury to put themselves in the place of the victims, and think about what must have been going through their minds during the time of the offenses. (*Id*. at 21). Clement believes that Mullins should have objected to these statements and requested a cautionary instruction, and that his failure to do so resulted in ineffective assistance. (*Id*.).

#### i.) Failure to object to prosecutor calling Clement a molester

The undersigned has already considered this claim in the context of an independent claim of prosecutorial misconduct and determined it lacks merit. Clement believes Mullins should have objected to a statement by Ms. Hewitt that Clement had been "molesting" the victims over a long period of time. (ECF No. 24-30 at 216). Mullins was asked at the habeas hearing why he did not object to statements made by the prosecutor, and he replied that it was his general belief that "unless you absolutely, positively can't stand it, objections during closing statements are not the best thing to do." (ECF No. 24-31 at 68). Mullins also stated that he believed it had been a "fair case," and he did not recall that the prosecutors acted improperly during the trial. (*Id*.). Mullins additionally asserted that it was his general belief that objecting to a closing statement often had the effect of calling the jury's attention to the statement in question; thereby, doing more harm than good. (*Id*. at 71).

The Circuit Court addressed this argument and concluded that Clement was unable to demonstrate he was prejudiced by a failure to object. (ECF No. 24-17 at 55-56). The Circuit Court's conclusion was not so clearly wrong as to be "beyond any possibility for

fairminded disagreement." *Harrington,* 562 U.S. at 103. As noted in the context of prosecutorial misconduct, the statement consisted of a single remark in a lengthy trial and was not a misrepresentation of the evidence presented. The undersigned **FINDS** that the state courts' conclusion that Mullins's failure to object to this remark did not have a reasonable probability of changing the verdict was not an objectively unreasonable determination. Accordingly, this claim should be dismissed.

*ii.) Failure to object to Golden Rule argument*

Clement additionally faults Mullins for failing to object to statements in which the prosecutor asked the jury to "put themselves in the place of" the victims by asking them to "think about what must have been going through the girls' minds" during the relevant time period. (ECF No. 38 at 21). Gaining insight from Clement's previous filings in the state courts, it appears that Clement is objecting to a statement made by Ms. Hewitt during closing arguments wherein she asked the jury to think about what the victims experienced. (ECF No. 24-17 at 91-92). Ms. Hewitt stated in closing argument:

> It's a long period of time that they were being molested by that man. They didn't say anything. They kept it a secret. If you apply that same logic, it's because, and I submit to you, maybe they thought they would get in trouble, too.
>
> And why do we keep secrets? It's because we think somebody might be angry with us or they might be disappointed in us or they might look at us differently. We may have let them down.
>
> In this case, you've got two children who had to come in here and sit there in front of strangers and talk about things children don't need or ever expect to have to talk about. Think of what it took for them to walk in here and do that. Somebody who had a position in their lives, that had been in their lives for most of their lives.

(ECF No. 24-30 at 216). Clement raised this argument in his direct appeal which was denied by the WVSC. (ECF No. 24-9 at 20, 24-10 at 2). The Circuit Court likewise

addressed this argument and concluded both that there "was no 'Golden Rule' violation," and that Clement was unable to show that Mullins's failure to object had any influence on the outcome of the trial. (ECF No. 24-17 at 56, 94).

Courts have recognized that so-called "Golden Rule" arguments are improper. These arguments occur when counsel argues "'the jurors should put themselves in the shoes of the plaintiff and do unto him as they would have him do unto them under similar circumstances.'" *United States v. Susi*, 378 F. App'x 277, 283 n.5 (4th Cir. 2010) (quoting *Ivy v. Security Barge Lines, Inc.*, 585 F.2d 732, 741 (5th Cir.1978)). "'Such an argument is universally recognized as improper because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence.'" *Id.*

Ms. Hewitt in her statement did not improperly appeal to the jury's sympathy, or ask the jury to make their determination from the position of the victims; rather, the statement was intended to contextualize why the victims may have waited, and why they did not immediately report Clement's behavior. (ECF No. 24-30 at 215-16). When Ms. Hewitt asked the jury to "[t]hink of what it took" for the victims to testify, she was attempting to show that talking about such matters is difficult for young children, especially when the perpetrator is a trusted adult. (*Id.*). The Fourth Circuit has previously held a similar argument made regarding the victim's perspective did not violate the Golden Rule because it "called for the jurors to decide whether the witnesses' testimony was plausible based on context." *Susi*, 378 F. App'x 277 at 283-84. This was the intended effect of Ms. Hewitt's statement, which asked the jury to consider why the victims remained silent for so long.

Accordingly, the state courts' determination was not so clearly in contravention of

federal law that there is no room for "fairminded disagreement" with respect to their conclusion that there was no Golden Rule violation. *Harrington,* 562 U.S. at 103. Similarly, the state courts' conclusion that Clement failed to meet the second *Strickland* prong of prejudice was not objectively unreasonable. The statement was isolated, was not egregiously inflammatory, and came at the end of a trial at which substantial evidence of Clement's guilt was introduced. *See Gilchrist v. Hagan*, No. CA 606-1236-MBS, 2007 WL 951749, at *30 (D.S.C. Mar. 27, 2007). The undersigned therefore **FINDS** that Clement has failed to show he is entitled to overcome the deference due to the state courts' conclusions as to this claim, and the claim should be dismissed.

### b. Failure to retain medical experts

Clement contends that Mullins provided ineffective assistance of counsel by failing to obtain a medical expert to "rebut" the prosecutor's claims. (ECF No. 20 at 15). Clement briefly expounds on this claim in his Reply, explaining that it is related to a report regarding Dr. Sharma, who provided counseling services to the victims and testified at trial. (ECF No. 38 at 21). Clement attached a medical treatment note prepared by an FRMS Health Systems employee on March 2, 2007 in support of this claim. (ECF No. 38-1 at 69). In the note, the employee documented Ms. Howell's statement that A.S.H. had been held in an emergency room overnight. (*Id.*). The note indicated that Dr. Sharma had reported A.S.H. would shortly be moved to the adolescent unit. The note added that Ms. Howell had inquired regarding having an examination of A.S.H. conducted. (*Id.*). Ms. Howell reported she was concerned that A.S.H. "may not be forthcoming with all information and may have been raped by molester." (*Id.*). It was recommended that Ms. Howell "speak to Dr. Sharma before questioning [A.S.H.] due to severity of current symptoms," and confirmed that she agreed to do so. (*Id.*).

While Clement does not articulate in his instant pleadings why he believes Mullins should have retained a medical expert, or how he believes the attached medical report supports this argument, the substance of his claim can be inferred from the state court record. (ECF No. 24-13 at 52). Clement made two related claims in his initial habeas proceeding that were considered by the Circuit Court. He claimed that Mullins provided ineffective assistance of counsel by failing to obtain a medical expert, who could have testified regarding the lack of physical evidence. (ECF Nos. 24-13 at 52, 24-17 at 60). Clement also faulted Mullins for failing to subpoena the victims' medical records, which he believed included a medical examination of the victims' genitalia that would have supported his case. (ECF No. 24-17 at 48, 60-61).

*i.) Failure to hire medical expert*

Mullins was questioned at the omnibus habeas evidentiary hearing regarding his decision not to obtain a medical expert regarding the physical evidence and stated:

> I have no understanding of what a medical expert would bring to the picture. By the time these charges were brought forth, years had passed. There would be no way to collect a DNA sample, to see if there was any bruising. You know, it's a different kind of case. It's not a case where a woman says that she was raped or a child says that they were raped and, within a very short period of time, this was reported.
> ...
>
> But, you know, there was nowhere to go with that theory of evidence because, by the time I was involved in the case, how was going and having a medical doctor examine the vagina or breast of a teenage female relating to an attack that supposedly occurred twelve months or two years earlier? I for the life of me can't see how that would have any bearing.

(ECF No. 24-31 at 62). Mullins additionally testified, that although he could not recall specifically reviewing the medical records of Dr. Sharma, consistent with his general practice and recollection of Clement's characteristics, he was certain that any relevant evidence related to Dr. Sharma's records would have been investigated. (*Id.* at 51, 64, 91-

92). The Circuit Court discussed this claim and concluded that Mullins's trial strategy and performance were constitutionally sufficient. (ECF No. 24-17 at 59-60). Mullins was not ineffective for failing to challenge the State's physical evidence as "[t]here was no physical evidence to be had, and its absence had nothing to do with [Clement's] guilt or innocence or with [Mullins's] diligence or lack thereof." (*Id.* at 60). The Circuit Court concluded that as the State had no physical evidence to offer in the case—a fact acknowledged by the prosecutor during *voir dire*—there would be no benefit in retaining a medical expert to rebut non-existent evidence. (*Id.* at 53, 60).

The state courts' determination that Mullins was not ineffective for failing to retain a medical expert to testify regarding physical evidence was not unreasonable. Clement has not in this petition, or throughout his state filings, credibly identified how retaining a medical expert would have assisted his defense. The trial took place over a year after the allegations surfaced, and there was no allegation that Clement had sexual intercourse with the victims. The State presented no physical evidence regarding the allegations; thus, introducing an expert to confirm that no physical evidence existed would do nothing to further the defense. Clement's speculation that a physical examination would have uncovered some unspecified exculpatory evidence is unconvincing. Accordingly, the undersigned **FINDS** that the state courts' determination that Mullins was not ineffective in this regard was not unreasonable.

### ii.) Failure to uncover medical evaluation

Clement argued in the state courts that Mullins was ineffective for failing to obtain examinations of the victims purportedly conducted by Dr. Sharma. (ECF No. 24-17 at 53). The Circuit Court concluded this claim lacked merit as he failed to show that any such examinations occurred. (*Id.*). In reaching this conclusion, the Circuit Court noted that the

evidence Clement relied on, the March 2, 2007 medical report provided in the instant petition, only confirmed that Ms. Howell had inquired about the possibility of having an examination performed, and that she had been instructed to speak with Dr. Sharma regarding her request. There was no evidence establishing what happened with that request thereafter. (*Id.* at 48). Furthermore, the Circuit Court noted that Ms. Howell testified at the second habeas evidentiary hearing and stated that she ultimately did not pursue an examination. (*Id.*).

To the extent that Clement's cursory reference to this report should be taken as an assertion of the claim he raised in his state habeas petition, he is unable to present a successful claim. The state courts' ruling on this claim rested on the lack of any evidence that an examination was conducted by Dr. Sharma. Therefore, to succeed on this claim Clement must demonstrate that this conclusion by the state courts' "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Under this standard, the fact that "[r]easonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's ... determination." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (quotation omitted).

The only evidence Clement has supplied in support of his assertion that Dr. Sharma had conducted an examination of one of the victims is a treatment note[7] documenting that the victims' mother inquired about having a medical examination and was told to speak with Dr. Sharma about the decision before proceeding. (ECF No. 38-1 at 69).

---

[7] The undersigned notes that this treatment note somewhat undermines Clement's theory that the allegations of assault were manufactured by the Howells, as it reveals that Ms. Howell was concerned the victims' were withholding details regarding more serious abuse and at least contemplated seeking a medical examination to uncover the extent of the abuse the victims might have suffered; actions inconsistent with a theory that the allegations were maliciously fabricated.

Throughout the course of Clement's lengthy state habeas proceedings, and throughout the instant federal proceedings in this Court, he has supplied no proof that a medical examination ever occurred. The Circuit Court, relying in-part on the testimony of the victims' mother that Dr. Sharma did not ultimately conduct a medical examination, concluded that no such examination occurred. This was not an unreasonable determination. In addition to Ms. Howell's testimony, Mullins testified at the habeas hearing that it was unlikely any relevant report prepared by Dr. Sharma, or by a third-party at his behest, would not have been uncovered by his and Clement's review of the evidence. (ECF No. 24-31 at 51, 64, 91-92).

Under these circumstances, where Clement has provided no evidence that medical examinations in fact occurred, he cannot show that the state courts' factual conclusion was unreasonable. Accordingly, the undersigned **FINDS** that this claim should be dismissed.

### c. Failure to investigate

Clement provides no details in support of his blanket claim that Mullins failed to investigate. While the undersigned has liberally construed Clement's petition, even under the less stringent standards afforded to *pro se* litigants, a claim must still contain sufficient factual allegations to support a valid cause of action. *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003). A court may not rewrite the pleading to include claims that were never presented, *Parker v. Champion*, 148 F.3d 1219, 1222 (10th Cir. 1998), construct the plaintiff's legal arguments for him, *Small v. Endicott*, 998 F.2d 411, 417-18 (7th Cir. 1993), or "conjure up questions never squarely presented" to the Court. *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

Additionally, "[t]o prevail on an [ineffective assistance of counsel] claim based on

a failure to investigate, a petitioner must specify 'what an adequate investigation would have revealed.'" *Walton v. Ballard*, No. 2:15-CV-11423, 2018 WL 1582737, at *7 (S.D.W. Va. Mar. 30, 2018), *appeal dismissed*, 738 F. App'x 159 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 2743 (2019) (quoting *Bassette v. Thompson*, 915 F.2d 932, 940–41 (4th Cir. 1990)). Clement provides no such details and no indication with respect to what additional actions he believes Mullins should have undertaken. Given that this claim lacks a factual basis upon which an assessment of its merits can be made, the undersigned **FINDS** that the claim should be dismissed.

### d. Failure to request Clement's case be analyzed under specific case law

Clement contends that Mullins provided deficient assistance by failing to request Clement's case be analyzed under the principles announced in *Rock v. Arkansas*, 483 U.S. 44 (1987). (ECF No. 20 at 15). In *Rock*, the Supreme Court considered whether a court had erred by forbidding a defendant from testifying about memories purportedly recovered under hypnosis and held that it had, stating "restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve." *Rock*, 483 U.S. at 55–56. The *Rock* Court further held that "[i]n applying its evidentiary rules a State must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify." *Id.* at 56. The Fourth Circuit has held that this case, and precedent following it, stand for the proposition that the Supreme Court has "rejected the use of any *per se* evidence rule favoring either the prosecution or the defense, and specified that a state court must determine, on a case-by-case basis, whether application of the rule is arbitrary or disproportionate to the State's legitimate interests." *Barbe v. McBride*, 521 F.3d 443, 457 (4th Cir. 2008) (quotation and citation omitted).

In this case, the Circuit Court did not exclude Clement's proffered evidence, the recorded interviews of the victims, based on the application of a *per se* rule, but rather, after extensively discussing the relevance of the proffered evidence, and concluding it was inadmissible under applicable evidentiary rules. (ECF No. 24-29 at 263-66, 24-30 at 5-12). The Circuit Court later considered Clement's argument, raised in his initial habeas petition, that the decision to exclude the evidence had violated the principles announced in *Rock*, and, after extensively discussing that case's application to the decision, concluded that the decision to exclude the evidence was appropriate. (ECF No. 24-17 at 54, 76-77, 81-85). Specifically, as to Clement's claim that Mullins provided deficient performance for failing to request that the admission of the recorded videotapes be considered under the principles espoused in *Rock*, the Circuit Court concluded Clement could not demonstrate prejudice as the videotapes were properly excluded and thus any such objection would have been overruled. (*Id.* at 54).

Clement is not arguing that Mullins failed to object to the exclusion of the recorded videotapes, or failed to argue in favor of their admission. Indeed, he clearly could not make this argument as Mullins extensively argued in favor of the recorded videotapes' admission. (ECF No. 24-29 at 263-66, 24-30 at 5-12). Instead, Clement argues Mullins's performance was defective because he did not specifically cite to *Rock* when making his argument. The undersigned has already considered the Circuit Court's decision to exclude this evidence and concluded that it did not violate Clement's right to a fair trial. Furthermore, the Circuit Court expressly held that a challenge based specifically on the holding in *Rock* would have been denied. As the Circuit Court did not initially err in excluding the evidence, the undersigned **FINDS** that its conclusion that Clement failed to show prejudice based on this claim was not objectively unreasonable. Accordingly, this

claim should be dismissed.

### e. Failure to object to instruction regarding the custodial abuse charge.

Clement asserts that Mullins provided ineffective assistance of counsel when he failed to object to the jury instructions pertaining to the custodial abuse counts. (ECF No. 38 at 22). Clement believes Mullins should have objected on the basis that the custodial abuse instructions failed to inform the jury specifically what type of "sexual contact" the jury could find Clement had committed with the victims. (*Id.* at 22-23).

The undersigned has already considered this issue when addressing Clement's claim that the Circuit Court erred in fashioning these instructions. There, the undersigned concluded that it was sufficient to define "sexual contact" for the jury and inform the jury that this was an essential element of the offense. As the jury instructions were legally sufficient, it was not deficient performance for Mullins to decline to raise an objection, nor could this decision prejudice Clement. "Failure to raise a meritless argument can never amount to ineffective assistance." *Moore v. United States*, 934 F. Supp. 724, 731 (E.D. Va. 1996); *see also Smith v. Robbins*, 528 U.S. 259, 287–88 (2000). As there is no merit to Clement's assertion that the jury instructions were insufficient, the undersigned **FINDS** that there is likewise no merit to his claim that Mullins was ineffective for failing to object to the instructions. Accordingly, Respondent's request for summary judgment should be granted as to this claim.

### f. Failure to object to forcible compulsion jury instruction

Clement argues that counsel was ineffective for failing to object to the jury instructions regarding forcible compulsion, an essential element of sexual abuse in the first-degree. (ECF No. 38 at 24). Clement asserts that the Circuit Court erred by not giving a definition of "resistance" in the instructions. (*Id.*). Clement believes that without this

definition, "[t]he jury had no way of knowing" that it was required to find the victims had actively resisted Clement, and that without this instruction, his constitutional due process rights were violated. (*Id.* at 24-26).

The Circuit Court considered this argument in Clement's initial habeas petition, and concluded that it lacked merit. (ECF No. 24-17 at 87). The Circuit Court found that Clement was mistaken that resistance was a component of the forcible compulsion requirement in his case, because the State relied on the age disparity component of the forcible compulsion requirement to prove its case. (*Id.*). The Circuit Court held, therefore, that the instructions with respect to the forcible compulsion element were "legally sufficient" and that, furthermore, the jurors were presented sufficient evidence to conclude that Clement used "intimidation, expressed or implied," to subject the minor victims to sexual assault. (*Id.* at 88).

Under West Virginia law, an individual is guilty of sexual abuse in the first degree when the individual "subjects another person to sexual contact without their consent, and the lack of consent results from forcible compulsion." W. Va. Code § 61-8B-7(1). "Forcible compulsion" is further defined as:

(a) Physical force that overcomes such earnest resistance as might reasonably be expected under the circumstances; or

(b) Threat or intimidation, expressed or implied, placing a person in fear of immediate death or bodily injury to himself or herself or another person or in fear that he or she or another person will be kidnapped; or

(c) Fear by a person under sixteen years of age caused by intimidation, expressed or implied, by another person who is at least four years older than the victim.

W. Va. Code § 61-8B-1(1). When instructing the jury regarding these counts, the Circuit Court informed the jury that, "[s]exual abuse in the first degree, a felony, is committed

when any person subjects another person to sexual contact without their consent, and the lack of consent results from forcible compulsion." (ECF No. 24-30 at 200, 203). The Circuit Court further defined "forcible compulsion" as follows:

> Forcible compulsion" means physical force that overcomes such earnest resistance as might reasonably be expected under the circumstances; or threat or intimidation, expressed or implied, placing a person in fear of immediate death or bodily injury to himself or herself or another person or in fear that he or she or another person will be kidnapped; or fear by a person under sixteen years of age caused by intimidation, expressed or implied, by another person who is at least four years older than the victim

(Id. at 200-01, 203). In closing argument, Ms. Hewitt outlined that "forcible compulsion" could be found in this case where:

> [Y]ou have such a variance in age, at least four years, and the children are under sixteen years of age and they're afraid —- and those girls told you that they were afraid of him, of how he behaved towards them, their grandmother. But that's enough. That's the intimidation. We're talking about children versus an adult. We don't expect a child to fight back the same way we would an adult victim.

(*Id*. at 221). Clement believes that the instructions with respect to sexual abuse in the first degree were inadequate because they did not include a definition of resistance. However, as noted by the Circuit Court, the State was not required to prove that the victims provided "resistance" to Clement's sexual advances, because of the age disparity between the victims and Clement. Both victims were, during the relevant time period, under the age of sixteen, and Clement was more than four years older than the victims. Accordingly, to find forcible compulsion, the jury needed only to conclude that the victims submitted to Clement's sexual advances due to "fear," caused by "intimidation, expressed or implied." W. Va. Code § 61-8B-1(1)(c). The jury was instructed in accordance with this statutory definition. (ECF No. 24-30 at 200-01, 203). This instruction was legally sufficient to allow the jury to determine that forcible compulsion occurred. *See Wamsley v. Ballard*, No.

CIV.A. 2:07 CV 41, 2008 WL 3286390, at *34 (N.D.W. Va. Aug. 8, 2008), *aff'd*, 307 F. App'x 754 (4th Cir. 2009).

The jury was not required to be instructed regarding the statutory definition of "resistance" due to the age disparity between the victims and Clement. Accordingly, Mullins did not provide objectively deficient performance for failing to raise a baseless challenge to the jury instruction. *See Moore*, 934 F. Supp. at 731. Likewise, Clement cannot demonstrate prejudice as any such challenge did not have a reasonable probability of succeeding. Accordingly, the undersigned **FINDS** that the state courts' resolution of this claim was not contrary to federal law, and Respondent's request for summary judgment should be granted.

### g. Failure to raise an *Ex Post Facto* challenge

Clement asserts that Mullins provided ineffective assistance by failing to object to the Circuit Court's "violation of *ex post facto* principle[s]," which resulted in a violation of Clement's constitutional rights. Clement does not elaborate on this claim. In his initial habeas petition, Clement raised the claim that he was incorrectly sentenced as the sentence provided by statute during the time he committed many of the crimes provided a lower statutory sentencing range, than that which was provided by a later amendment of the statute. (ECF No. 24-17 at 100-01). The State agreed with Clement, and the Circuit Court imposed a new sentence which complied with the statutory regime in place at the time Clement committed the crimes for which he was convicted. (*Id.*).

To the extent Clement wishes to raise this claim again, his argument has already been accepted by the state courts, and he has been resentenced. Raising the claim as one of ineffective assistance of counsel does not change the fact that any relief to which Clement would be entitled with respect to this claim has already been granted. To the

89

extent Clement is attempting to raise a new claim of an *ex post facto* violation, he does not provide sufficient details for the undersigned to construe, even under the liberal standard to which *pro se* petitions are subject, a valid claim. Accordingly, the undersigned **FINDS** that this claim lacks merit and is subject to summary judgment.

### h. Failure to object to unconstitutional statute

Clement asserts that Mullins provided constitutionally deficient performance by not stating "an objection to the unconstitutional violation of the Statute of Sexual Assault." (ECF No. 20 at 15). Clement provides no further explanation of this claim, nor does he offer a rationale as to why he believes Mullins should have challenged the constitutionality of the statutes under which Clement was sentenced. A review of the record does not illuminate the argument. Accordingly, the undersigned **FINDS** that this claim should be summarily denied.

### i. Failure to call witnesses

Clement alleges that Mullins's performance was constitutionally deficient due to his failure to call a witness, who could have impeached the victims' testimony. (ECF No. 20 at 15). Clement claims that Mullins failed to investigate potential exculpatory witnesses—Howell's sister, "Kimberly," and her husband—who Clement believes could have testified that the victims did not "stay every weekend at their grandmother's home." (ECF No. 38 at 26). Furthermore, according to Clement, this witness could have testified that the victims "NEVER called [Clement] 'grandpa' as alleged by the State." (*Id.*).

Mullins testified at the habeas evidentiary hearing that he conferred with Clement regarding potential witnesses, but "the case was not an expansive case to where there were a lot of people to be interviewed." (ECF No. 24-31 at 72-73). The Circuit Court considered a claim Clement raised alleging that Mullins was ineffective for failing to call as a witness

"Mr. Howell's sister," but rejected it, finding that Clement "made no effort to prove" the claim. (ECF No. 24-17 at 56-57). The Circuit Court noted that Clement did not call the witness at the hearing, did not provide an affidavit produced by the witness describing her potential testimony, and did not even provide her name. (*Id.*).

Despite the fact that the state courts ruled against Clement based on his failure to provide reliable proof that the witnesses would have provided relevant exculpatory testimony, his pleadings in federal court continue to lack any evidentiary support; such as a proffer of the allegedly exculpatory testimony the witnesses would have provided. Clement identifies two potential witnesses, "Mr. Howell's sister Kimberly," and the sister's husband. (ECF No. 38 at 26). Clement does not provide affidavits from these witnesses detailing the testimony they would have been able to provide, nor does he establish their personal knowledge of the issue.

The state courts' determination that Mullins did not performed below the constitutional minimum by declining to call these purportedly exculpatory witnesses was not objectively unreasonable. "[T]he decision whether to call a defense witness is a strategic decision demanding the assessment and balancing of perceived benefits against perceived risks, and on to which we must afford enormous deference." *United States v. Terry*, 366 F.3d 312, 317-18 (4th Cir. 2004). Accordingly, courts are generally "reluctant to find ineffective assistance based upon complaints regarding uncalled witnesses." *Lenz v. True*, 370 F. Supp.2d 446, 479 (W.D.Va.2005). A petitioner is usually unable to show that "he was prejudiced by the absence of a witness' testimony unless he demonstrates 'not only that [the] testimony would have been favorable, but also that the witness would have testified at trial.'" *Sanford v. Clarke*, No. 1:18CV303 (LMB/TCB), 2019 WL 472256, at *15 (E.D. Va. Feb. 6, 2019), *appeal dismissed*, 778 F. App'x 269 (4th Cir. 2019) (quoting

*Alexander v. McClotter*, 775 F.2d 595, 602 (5th Cir. 1985)). As Clement failed, and continues to fail, to provide a reliable proffer of what exculpatory testimony the witnesses would have provided, the state courts did not err in determining that his attorney was not incompetent for declining to call these witnesses. *See Bassette v. Thompson*, 915 F.2d 932, 940–41 (4th Cir. 1990) (finding that in "the absence of a proffer of testimony from a witness or witnesses he claims his attorney should have called," the petitioner was unable to establish ineffective assistance of counsel); *see also Hill v. United States*, No. 2:15-CR-00026, 2019 WL 3425049, at *17 (S.D.W. Va. May 21, 2019), *report and recommendation adopted*, No. 2:15-CR-00026, 2019 WL 2745852 (S.D.W. Va. July 1, 2019) ("Vague, unsupported allegations of ineffective assistance of counsel based on an attorney's failure to subpoena or call witnesses are insufficient under *Strickland*."); *United States v. King*, No. 1:08CR00041, 2014 WL 1906695, at *10 (W.D. Va. May 13, 2014) (finding the petitioner was unable to establish ineffective assistance of counsel based on counsel's failure to call witnesses where he did "not present any affidavits from these witnesses, indicating that they would have provided testimony exculpatory to [the petitioner] at trial."); *Walton v. Ballard*, No. 2:15-CV-11423, 2017 WL 8780139, at *17 (S.D.W. Va. Nov. 20, 2017), *report and recommendation adopted*, No. 2:15-CV-11423, 2018 WL 1582737 (S.D.W. Va. Mar. 30, 2018), *appeal dismissed*, 738 F. App'x 159 (4th Cir. 2018) ("[The petitioner's] bare statement that his counsel failed to call three unnamed alibi witnesses is insufficient."). Moreover, considering that the identified witnesses are aligned by blood and familial bond with Howell, it requires this Court to make a significant and unsupported analytical leap to conclude that the witnesses would have been favorable.

As the state courts' determination that counsel was not deficient for his failure to present these defenses was not contrary to, nor an unreasonable application of, federal

law, the undersigned **FINDS** that Respondent's summary judgment motion should be granted as to this claim.

### j. Failure to subject State's case to meaningful adversarial process

Clement notes that the prosecutor, in closing arguments, asserted that Clement "presented no evidence to contradict the victims' testimony." (ECF No. 38 at 27). Clement objects to the prosecutor construing the evidence in that light "at the last possible time where the Defense could not object." (*Id.*). Clement faults Mullins for not having called witnesses to disprove the prosecutor's contention. (*Id.*). The Circuit Court considered this argument as raised in Clement's initial habeas petition and concluded that it lacked merit. (ECF No. 24-17 at 59). The Circuit Court believed that Mullins "faced an uphill battle," and that the strategy Mullins chose in creating a defense was reasonable and well within the confines of competent representation. (*Id.* at 60).

A defendant has been denied effective assistance of counsel where "a lawyer entirely fails to subject the prosecution's case to meaningful adversarial testing, thus making the adversary process itself presumptively unreliable." *Glover v. Miro*, 262 F.3d 268, 275 (4th Cir. 2001) (quotation omitted). Demonstrating that one's counsel so completely failed to serve as an advocate—to the extent that it amounted to the "constructive denial" of counsel—is a far more demanding standard than showing that counsel was merely objectively deficient as "[i]neffective assistance is not the same thing as an absence of assistance." *Id.*

Contrary to Clement's claim, the record establishes that Mullins did subject the State's case to meaningful adversarial testing. Mullins described his trial strategy at length during Clement's omnibus evidentiary hearing, explaining that his goal was to minimize the amount of time the minor victims were on the stand and highlight potential

motivations on behalf of the victims' parents to fabricate the allegations. (ECF No. 24-31 at 22, 32). Mullins believed the best option was not to aggressively cross-examine the victims, but to "attack the procedural foundation for the allegations rather than me attack under cross-examination these two young children." (*Id.* at 58). To that end, Dr. Clayman was retained, and although he was unwilling to offer an opinion that the victims' testimony was false, was able to testify regarding questionable aspects of the statements provided by the victims. (*Id.* at 27). Mullins at trial additionally questioned the propriety of the case being investigated by law enforcement officers who were colleagues of Howell. (ECF No. 24-29 at 208, 24-30 at 16-17).

Looking at the entire picture, Mullins's trial strategy was reasonable, and his execution of that strategy fell well within the parameters of reasonable professional assistance. Undoubtedly, his representation was not so poor as to amount to constructive denial of counsel. Mullins faced the unenviable challenge of defending against not one, but two, sympathetic minor victims, who testified that Clement repeatedly sexually assaulted them during visits with their grandmother. Choosing to focus on the motivations of the parents, one of whom was a West Virginia State Trooper who was arguably closely involved in the investigation of the case, rather than aggressively challenging the young victims, was a logical strategic choice. Clement now claims that Mullins failed to effectively rebut the victims' testimony; however, Clement does not articulate an alternate strategy. Accordingly, the undersigned **FINDS** that the state courts' conclusion that Clement was not deprived of his right to representation due to Mullins's failure to challenge the State's case was neither contrary to, nor an unreasonable application of, federal law, and Respondent's motion for summary judgment should be granted as to this claim.

94

### k. Failure to hire an independent forensic expert

Clement believes Mullins was ineffective for failing to hire an independent medical expert who could have discredited the prosecutor's argument that the lack of physical evidence was to be expected given the nature of the allegations. (ECF No. 20 at 16). Clement elaborates on this claim, explaining that he wanted Dr. Sharma to be called as a witness. (ECF No. 38 at 27). Clement believes that Dr. Sharma performed a medical examination of one of the victims, and this examination would have revealed exculpatory information. (*Id.*).

The undersigned has already considered this claim and concluded that the state courts' determination that Clement failed to show how retaining a medical expert would have benefited his defense was not unreasonable. Additionally, the undersigned has found that the state courts' rejection of Clement's claim that Mullins should have obtained evidence related to a purported medical examination by Dr. Sharma is not subject to reversal under the AEDPA standards. As this claim is merely a reformulation of two previously rejected claims, the undersigned **FINDS** that this claim is subject to summary judgment.

### l. Failure to subpoena the victims' medical records

Clement asserts that both Mullins and Hoosier failed to subpoena the medical records of the victims, "including but not limited to those from Dr. Sharma." (ECF No. 38 at 27-28). Clement provides no details regarding the medical records he believes counsel should have sought, or what exculpatory evidence he believes they may have revealed, and the undersigned has already considered and rejected Clement's claims as related to the medical records of Dr. Sharma. Accordingly, the undersigned **FINDS** that Respondent's motion for summary judgment should be granted as to this claim.

### m. Failure to investigate the school records of the victims

Clement asserts that Mullins's performance fell below the range of professional competence because he failed to investigate and present evidence related to the victims' school records. (ECF No. 20 at 16). Clement asserts that had Mullins pursued this line of investigation, he could have revealed that the victims' were doing poorly in school "way before" the time period relevant at trial. (ECF No. 38 at 28).

During opening argument, Mr. Harris stated that "as in a lot of cases where this kind of thing is going on, there were things going on in their lives that didn't make any sense to their parents. Grades were going down, acting out, threats of 'I'd like to die,' that sort of thing…" (ECF No. 24-29 at 97). A.S.H. testified at trial that, during the time Clement was abusing her, among other negative repercussions, her grades suffered due to anxiety and emotional disturbance caused by the abuse. (*Id.* at 120-21). The Circuit Court briefly considered this claim, but rejected it, finding that Clement had failed to offer any evidence in support of his assertion that an investigation of the children's school records would have benefitted his defense. (ECF No. 24-17 at 61).

Despite the state courts' ruling, Clement again fails to support his claim related to the victims' school records. He has provided no evidence, either before this Court, or during the course of his lengthy state proceedings, to corroborate his conclusory assertion that the victims were experiencing difficulty at school prior to the alleged sexual abuse. As the undersigned has previously noted, when a petitioner seeks to overturn his conviction on the basis that counsel was ineffective for failing to present exculpatory evidence, he must provide some reliable indication that the evidence in question both existed and was materially exculpatory. *See e.g. Walton v. Ballard*, No. 2:15-CV-11423, 2017 WL 8780139, at *17. As Clement did not do this before the state courts, and

continues to fail to make such a demonstration here, the state courts' rejection of this claim was reasonable.

In any event, the victims' testimony did not hinge on the fact that their grades began to suffer. Evidence that the victims had poor grades or experienced difficulty at school prior to the time of the criminal allegations does not disprove their claims of sexual assault. Accordingly, even assuming such evidence existed, and Mullins failed to pursue it, Clement has not demonstrated that he was materially prejudiced by this failure. Indeed, while attacking A.S.H.'s allegations of sexual assault on the basis that her grades did not significantly change after the abuse might provide some marginal evidence on the issue of credibility, such a tact could just as easily have backfired and been perceived as a desperate attack on a child. Under the doubly deferential standard that applies to claims of ineffective assistance of counsel raised under § 2254, the undersigned **FINDS** that Clement has failed to show both that his attorney provided ineffective assistance of counsel in this regard, and that the state courts unreasonably denied his claim. Accordingly, Respondent's request for summary judgment is warranted.

### n. Failing to call witness

Clement asserts that Mullins provided ineffective assistance by failing to call a witness who knew the family and victims. (ECF No. 20 at 16). Clement goes on to explain that he believes Mullins should have called Dorothy Brooks to testify at trial. (ECF No. 38 at 28). Clement states that Ms. Brooks would have testified that the victims did not spend every weekend at their grandmother's house. Ms. Brooks also could have testified that Clement was not a custodian of the victims. (*Id.*).

Clement submitted an affidavit prepared by Ms. Brooks in his first state habeas petition. (ECF No. 24-11 at 55). In the affidavit, Ms. Brooks made a number of assertions,

including that she frequently spent the night at the residence of Clement and Ms. Candler. (*Id.* at 55). Ms. Brooks stated that Clement went to bed at 11:00 at night, Ms. Candler frequently stayed up later than 11:00 p.m., and that Ms. Brooks never witnessed Clement act inappropriately toward the victims. (*Id.*). Ms. Brooks further asserted that the victims "would exhibit rebellious behavior" and that they "never suffered a sexual abuse profile but behave[d] like normal children until they didn't get their way." (*Id.*). Finally, Ms. Brooks stated that she possessed other useful information due to her close relationship with the victims' family and would have been willing to testify at trial. (*Id.*).

The Circuit Court considered this claim in Clement's initial habeas petition and concluded that Clement failed to establish Mullins was ineffective for declining to call this witness at trial. (ECF No. 24-17 at 61-63). In so doing, the Circuit Court recounted the information contained in the affidavit at length, and concluded that it was "hardly a get-out-of-jail-free card for" Clement. (*Id.* at 61-62). The Circuit Court noted that little of the information in the affidavit was materially exculpatory, and, while it described what Ms. Brooks observed when she spent the night at Clement's residence, the affidavit did not indicate the frequency with which Ms. Brooks stayed at Clement's residence overnight, or whether these visits coincided with the victims' overnight visits. (*Id.* at 62). The Circuit Court then considered Mullins's testimony at the habeas hearing regarding his investigation of potential witnesses. (*Id.* at 62-63). The Circuit Court ultimately concluded that, based on the record before it, Mullins "made an investigation—a reasonable and adequate investigation—and that, for one reason or another, [Mullins] decided not to call Ms. Brooks as a witness." (*Id.* at 63). The Circuit Court held Clement had failed to demonstrate this decision was deficient. (*Id.*).

The Circuit Court's conclusion was not an objectively unreasonable application

of federal law. Clement asserts in the instant petition that Ms. Brooks would have been able to testify that the victims did not stay at Clement's residence every weekend, and that Clement did not have custodial duties with respect to the victims. (ECF No. 38 at 28). However, neither of these claims is supported by the affidavit Clement presented to the Circuit Court, and he has not provided a new affidavit. (ECF No. 24-11 at 55). Ms. Brooks stated that she was a frequent overnight guest at Clement's residence, but she provided no details regarding the frequency with which the victims stayed overnight. Additionally, Ms. Brooks did not indicate in the affidavit that she would be able to provide testimony that would establish Clement was not a custodian of the victims.

The affidavit supplied by Ms. Brooks does not contain direct evidence negating the sexual assault claims, nor materially exculpatory testimony. As noted by the Circuit Court, Ms. Brook's judgment that the victims did not "exhibit a sexual abuse profile," but rather acted like "normal children until they didn't get their way," would likely have been an expert opinion that she was not qualified to deliver. (ECF No. 24-17 at 62); *see also United States v. Thomas*, No. CRIM. CCB-03-0150, 2006 WL 140558, at *12 (D. Md. Jan. 13, 2006) (discussing case law related to expert psychiatric opinions). The remaining information provided by Ms. Brooks is largely related to the bedtimes of Clement and Ms. Candler, as observed by Ms. Brooks, which is an inadequate basis upon which to find that Mullins was ineffective for failing to call Ms. Brooks as a witness.

The Circuit Court witnessed Mullins testify at the habeas hearing and weighed Mullins's testimony that he considered all potential defense witnesses with Clement against the evidence in the affidavit proffered by Clement. The Circuit Court concluded that Ms. Brooks was not so valuable a defense witness that the failure to call her at trial constituted ineffective assistance of counsel. (ECF No. 24-17 at 62-64). "Decisions about

99

what types of evidence to introduce 'are ones of trial strategy, and attorneys have great latitude on where they can focus the jury's attention and what sort of mitigating evidence they can choose not to introduce.'" *Wilson v. Greene*, 155 F.3d 396, 404 (4th Cir. 1998) (quoting *Pruett v. Thompson*, 996 F.2d 1560, 1571 n. 9 (4th Cir. 1993)). "The decision whether to call a defense witness is the epitome of a strategic decision that demands the assessment and balancing of perceived benefits against perceived risks and is afforded 'enormous deference.'" *Thorne v. United States*, No. 3:13-CR-293-MOC-1, 2020 WL 3513707, at *11 (W.D.N.C. June 29, 2020) (quoting *United States v. Terry*, 366 F.3d 312, 317 (4th Cir. 2004)). Given these standards and the record before the Court, the undersigned **FINDS** that the state courts' determination was not objectively unreasonable under the governing AEDPA provisions. Accordingly, Respondent's request for summary judgment should be granted as to this ground for relief.

### o. Failure to request cautionary instruction

Clement argues that Mullins provided ineffective assistance of counsel by failing to request a cautionary instruction under Rule 404(b) of the West Virginia Rules of Evidence. (ECF No. 38 at 28-29). However, in his explanation, Clement actually faults the Circuit Court, not counsel, for this error as he states that Mullins did in fact request a cautionary instruction, but the Circuit Court forgot to include it and "is now trying to escape the error by stating it would not have made a difference." (*Id.*).

The Circuit Court considered a claim raised by Clement in his initial habeas petition in which Clement alleged that Mullins provided ineffective assistance of counsel for failing to request a cautionary instruction regarding other bad acts. (ECF No. 24-17 at 65). The Circuit Court noted that Mullins did request, and was granted, a cautionary instruction regarding other bad acts, and the jury received the instruction at the end of

trial. (*Id.*). Clement, however, objected to the fact that Mullins failed to request the cautionary instruction at the time the testimony was presented. (*Id.*). The Circuit Court agreed that Mullins had erred by not doing so, but determined that this error did not result in prejudice because the jury was ultimately instructed to disregard allegations of wrongful conduct not charged, and the evidence of Clement's guilt was substantial. (*Id.* at 66).

During the discussion of jury instructions, Mullins stated that he wished to submit an instruction under Rule 404(b) with respect to uncharged conduct that was presented at trial. (ECF No. 24-30 at 175-76). Specifically, Mullins indicated that the victims' testimony had at times gone beyond conduct charged in the indictments, which only covered the period from September 2005 to December 2006. (*Id.* at 176). Mullins also referred to testimony from other witnesses, noting that "[t]his case is virtually full of criminal acts committed by my client against the people who testified in this case. So they've made him out to be a bad man." (*Id.* at 176). The Circuit Court noted that curative instructions related to collateral bad acts or crimes generally should be given at the time the testimony is introduced, but agreed to provide a curative instruction. (*Id.* at 176-81). The Circuit Court later instructed the jury: "[y]ou have heard evidence of other alleged crimes to which the defendant is not charged within the indictment before you. You are not to consider such allegations as evidence of the defendant's guilt on the charges contained in the indictment." (*Id.* at 212).

It is unclear whether Clement faults his trial counsel or the Circuit Court for the delayed instruction, as he accuses both of failing to protect his rights. (ECF No. 38 at 28-29). To the extent that Clement faults the Circuit Court for failing to provide a jury instruction after Mullins requested one, he is unable to do so as the Circuit Court did

provide a curative instruction to the jury following Mullins's request. (ECF No. 24-30 at 212). The West Virginia Supreme Court has held that, following the introduction of other bad acts or crimes under Rule 404(b), "where requested, the trial court is required to give a limiting instruction." *State v. McGinnis*, 193 W. Va. 147, 156 (1994). However, "the trial court is under no obligation to give a limiting instruction unless one is requested." *Id.* Accordingly, as the Circuit Court did provide an instruction when specifically requested by Mullins, Clement is unable to show any error made by the Circuit Court.

 While Clement's claim is short on details, he does not explicitly argue that Mullins provided ineffective assistance by entirely failing to request a curative instruction; an argument he cannot make as Mullins did request such an instruction, which was subsequently given to the jury. Accordingly, in order to prevail on this claim, Clement must establish both that the *delay* in requesting the instruction was prejudicial, and that the state courts' determination to the contrary was objectively unreasonable. This he is unable to do. The Fourth Circuit has previously considered a similar claim, as raised on appeal, challenging the district court's failure to provide a contemporaneous curative instruction with respect to the analogous Federal Rule 404(b), and concluded that a limiting instruction given during the final instructions to the jury presumptively cures any failure to provide a contemporaneous limiting instruction. *United States v. Mark*, 943 F.2d 444, 449 (4th Cir. 1991). The Fourth Circuit stated that the defendant provided "no authority to this Court which would support a view that a limiting instruction concerning the purpose of Rule 404(b) evidence should be given contemporaneously with the evidence, let alone his view that such an instruction is fatally deficient if not given until the final charge." *Id.* at 449 n.2.

The Circuit Court concluded that Clement was unable to demonstrate the prejudice

prong of *Strickland* based on this claim, as a limiting instruction was ultimately provided, and the evidence of guilt was substantial. (ECF No. 24-17 at 66). This conclusion is not so contrary to federal law as to be objectively unreasonable. As noted, the Fourth Circuit has held that a limiting instruction given during the final jury instructions presumptively cures any error stemming from the failure to give contemporaneous limiting instructions with respect to 404(b) evidence. *Mark*, 943 F.2d at 449. The Fourth Circuit has additionally realized that declining to request a contemporaneous limiting instruction is often a reasonable strategy as a contemporaneously provided curative instruction may have the effect of highlighting, rather than downplaying, damaging testimony. *See United States v. Byers*, 649 F.3d 197, 213 (4th Cir. 2011). Mullins requested and received a limiting instruction with respect to any testimony regarding crimes not charged in the indictment and such an instruction was given. Thus, the undersigned **FINDS** the state courts' conclusion that Mullins's delay in requesting the instruction did not have the probability of changing the outcome at trial was not so clearly wrong so as to be "beyond any possibility for fairminded disagreement." *Harrington,* 562 U.S. at 103. Accordingly, Respondent's request for summary judgment should be granted as to this claim.

### p. Failing to request limiting instruction regarding statements made by prosecutor

Clement alleges that Mullins provided constitutionally ineffective assistance when he failed to object to inflammatory statements made by the prosecution. (ECF No. 20 at 16). The Circuit Court considered this claim, but rejected it, concluding that, as it had already found that the prosecutor's remarks did not render Clement's trial unfair, Clement was unable to demonstrate prejudice stemming from this alleged failure. (ECF No. 24-17 at 55-56). Clement objects to this  holding, accusing the Circuit Court of acting

as "a clairvoyant" in making this determination. (ECF No. 38 at 29).

While Clement does not identify the statements he believes Mullins should have objected to, he likely refers to the same comments against which he raised an independent due process claim. The undersigned has already assessed this argument, in the context of considering Clement's claim that the prosecutor's statements resulted in an unfair trial, and found that the claim lacked merit, because the comments were isolated and not unduly prejudicial. As the undersigned has found that the allegedly inflammatory statements made by the prosecutor in closing arguments did not materially prejudice Clement, he is unable to demonstrate that the state courts' determination he did not suffer prejudice based on counsel's failure to object to the statements was an objectively unreasonable application of federal law. The undersigned therefore **FINDS** that Clement is unable as a matter of law to succeed on this claim, and Respondent's request for summary judgment should be granted.

### q. Failure to communicate plea offer

Clement faults Mullins for failing to inform him about a plea offer presented by the State. (ECF No. 20 at 16). Clement asserts that he was unaware of any plea offers made by the prosecutor until Mullins's testimony at the habeas hearing regarding plea discussions. (ECF No. 38 at 32). Clement states that Mullins never discussed the possibility of a plea deal with Clement before trial, and faults the state courts for overlooking his claim that Mullins failed to communicate a plea offer. (*Id.* at 30-31). Clement attaches an affidavit related to this claim, in which he asserts that he was unaware of the plea deal discussed by Mullins at the habeas hearing, and that, had he been made aware of this offer, he would have accepted it. (ECF No. 38-1 at 73).

The Circuit Court considered this argument as raised by Clement in his initial

habeas proceeding and found it unavailing. The Circuit Court first noted that Clement's claim he was unaware of any plea offer from the State was in contrast to Mullin's testimony at the hearing, that the "plea offer was utterly unappealing and that [Clement] was aware of this." (ECF No. 24-17 at 68). The Circuit Court specifically found that "Mullins testified credibly and that [Clement] was aware of" the plea offer. (*Id.*). Furthermore, the Circuit Court concluded that, assuming he had not known of the plea offer, Clement had failed to demonstrate a reasonable probability that he would have accepted the offer had he been aware of it. (*Id.*).

At the evidentiary hearing, Mullins was asked about his negotiation of plea offers during his representation of Clement and answered as follows:

> Hoosier: Concerning the preparation for this trial, was there any plea negotiations with the State?
>
> Mullins: Yes, there was.
>
> Hoosier: Can you talk about that a little bit?
>
> Mullins: "We'll let you plead guilty to ten and we'll drop twenty." I mean, Mr. Harris felt like he had a very firm case. Mr. Harris had a state trooper that was the parent of the victims. He had two teenage children that appeared to be very coherent and very responsible witnesses, and he took the case very seriously. Quite frankly, one of his main goals — I don't want to put words in his mouth, but he felt that [Clement] needed to go away for the rest of his life.

(ECF No. 24-31 at 38). Mullins was again questioned regarding his negotiation of plea offers on cross examination:

> Mr. Harris: Did [Clement] fully understand before this trial started that you felt he was fighting an uphill battle?
>
> Mullins: Yes, sir.
>
> Mr. Harris: And did he indicate that he wanted you to fight that uphill battle or that he wanted you to try to negotiation some kind of settlement for him?

Mullins: Well, Your Honor, excuse me -- Mr. Harris, in all due respect, you were a very tough negotiator, and the plea that was offered would not have made any meaningful difference in the outcome of this situation. He's a 52 year old man and, if he gets a 30-year sentence, even if he had pled guilty to one or two of the charges and got 30 years, we were sort of put in the position, as many defendants and defendants' counsel are in certain very high-profile difficult cases, that we had to just roll the dice, because we knew what one outcome was. One outcome was, we take the plea and go to jail for the rest of our lives. And the other outcome maybe a country jury that walks out of here and doesn't believe those two children and he's not guilty. So –

Mr. Harris: And he understood that? Did you discuss that with [Clement]?

Mullins: Time and time and time again.

Mr. Harris: And did you discuss with him the fact that I  wasn't willing to make a very favorable plea offer to him?

Mullins: That's correct. Mr. Clement, in 25 years of practicing law, is serving more time than any criminal defendant that I've ever represented.

(ECF No. 24-31 at 87-88).

As a general rule, "defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Missouri v. Frye,* 566 U.S. 134, 145 (2012). It follows, then, that when considering *Strickland* in the context of plea negotiations, the failure of defense counsel to communicate a favorable plea offer to his client will usually fall below an objective standard of reasonableness. *Id.*

As an initial matter, while Clement asserts he first learned of the existence of a plea offer during Mullins's habeas testimony, Mullins did not testify regarding a specific formal plea offer made by the State. Rather, Mullins discussed the general tenor of plea discussions with Mr. Harris, and the fact that Mr. Harris was relatively inflexible and unwilling to offer an acceptable plea deal. (ECF No. 24-31 at 38, 87-88). The closest Mullins came to mentioning anything approaching a concrete deal was his statement that

plea bargaining consisted of offers such as "[w]e'll let you plead guilty to ten and we'll drop twenty." (*Id.* at 38). Mullins also later stated that "the plea that was offered would not have made any meaningful difference" as it would have effectively resulted in a life sentence for Clement. (*Id.* at 87-88). There is no indication that the conversation with Mr. Harris advanced beyond general and conditional discussions of a deal, or that a formal plea offer was ever made. Indeed, no written plea offer has surfaced. *See Young v. United States*, No. 2:09-CR-00223-01, 2016 WL 5496517, at *7 (S.D.W. Va. Sept. 29, 2016), *aff'd*, 685 F. App'x 181 (4th Cir. 2017) (discussing distinction between formal and informal plea bargaining).

Nevertheless, "it is at least arguable that failure to communicate a preliminary communication ... could constitute deficient performance." *Id.* Accordingly, the undersigned will consider this claim as an objection to Mullins's failure to discuss with Clement the preliminary communications and general discussion of a plea agreement. As Clement is attempting to raise this claim in a § 2254 petition, however, he must not only demonstrate that (1) Mullins failed to communicate to Clement that the State was willing to consider a potential plea agreement and (2) absent this omission, he would have been accepted and been granted a plea deal more favorable than the result of going to trial, but he must also show that (3) the state courts' determination to the contrary was unreasonable.

Mullins testified at the habeas hearing that he and Clement discussed the possibility of a plea deal, but that given Clement's age, and Mr. Harris's refusal to offer a significant reduction in charges, the only chance Clement had at receiving anything other than an effective life sentence was to go to trial—an assessment with which Clement agreed. (ECF No. 24-31 at 87-88). The state courts credited this testimony over Clement's

assertion that he was unaware of the possibility of any plea deal. In order "for a federal habeas court to overturn a state court's credibility judgments, the state court's error must be stark and clear." *Merzbacher v. Shearin*, 706 F.3d 356, 364 (4th Cir. 2013) (quotation omitted). "Credibility determinations, such as those the state ... court made regarding [a witness], are factual determinations. As such, they 'are presumed to be correct absent clear and convincing evidence to the contrary, and a decision adjudicated on the merits and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.'" *Wilson v. Ozmint*, 352 F.3d 847, 858 (4th Cir. 2003) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Clement has failed to overcome the presumption of correctness which attaches to the state courts' credibility determination. Mullins's testimony that he and Clement discussed the possibility of a plea agreement, but came to the conclusion that, based on Clement's age and Mr. Harris's unwillingness to offer a favorable deal, going to trial was the best available option was lucid and consistent. Clement's assertions regarding this issue are less convincing. Accordingly, the undersigned **FINDS** that Clement has not demonstrated that the state courts' finding that Mullins did in fact communicate with Clement regarding plea deals should be overturned.

Clement is additionally unable to show that the state courts erred in determining that he failed to demonstrate he would have accepted the potential plea deal discussed by Mullins. Clement objects to this determination and asserts in an affidavit before this Court that "I most assuredly would have considered and would have taken the plea offer if I had known about it." (ECF No. 38-1 at 73). Clement does not state precisely what he believes were the terms of the plea offer, or what he was willing to consider as acceptable. As noted, Mullins did not confirm that a concrete plea agreement was offered; instead, he

merely stated that Mr. Harris was unwilling to offer acceptable terms, because Mr. Harris wanted Clement to serve a life sentence.

In objecting to the state courts' determination on this issue, Clement attempts to thread an impossibly thin needle. Throughout the entire petition he raises numerous claims vehemently protesting his innocence and alleging that he would easily have been acquitted at trial absent errors made by his counsel and the Circuit Court. However, in this claim, he abruptly reverses course and asserts that he would have been eager to plead guilty to the charges if he had known that the State offered a plea agreement, whatever the terms of such an agreement might have been. Clement's assertion that he was willing to accept the unfavorable potential deals described by Mullins at the habeas hearing had he known of them is belied by his repeated insistence that he is innocent and was convicted on insubstantial evidence. When contrasted with Mullins's coherent and credible testimony that Clement was willing to go to trial as no acceptable plea offer was forthcoming from the State, Clement's inconsistent position is not persuasive. Accordingly, the undersigned **FINDS** that Clement has failed to show that the state courts' rejection of this claim was unreasonable, and summary judgment should be granted as to this ground.

### 8. Actual Innocence

Clement argues that he is entitled to relief as "there was no evidence except stories from the alleged victims" presented at trial. (ECF No. 20 at 17). Clement further contends that victims' father was "vindictive" against Clement, and that an expert witness testified at trial that the victims had received coaching during their interviews.

In *Herrera v. Collins*, 506 U.S. 390 (1993), the Supreme Court found that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a

ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." 506 U.S. at 400. The Supreme Court further found that, "habeas jurisprudence makes clear that a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 404. In a later case, the Court added that it has "not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence." *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013), (citing *Herrera*, 506 U.S. at 404–05). Therefore, as it presently stands, a freestanding claim of actual innocence has not been recognized by the Supreme Court or by the Fourth Circuit outside of the capital context. *See Smith v. Mirandy*, No. 2:14-cv-18928, 2015 WL 1395781, at *4 (S.D. W. Va. Mar. 25, 2015); *Cooper v. O'Brien*, No. 5:14-cv-00112, 2015 WL 13735779, at *3 n.5 (N.D. W. Va. Aug. 28, 2015), *report and recommendation adopted*, 2015 WL 6085717 (N.D. W. Va. Oct. 16, 2015), *aff'd*, 639 F. App'x 196 (4th Cir. 2016) ("Thus, a freestanding claim of actual innocence is not cognizable in federal habeas corpus and such claim should be dismissed."); *Teleguz v. Pearson*, 689 F.3d 322, 328 n.2 (4th Cir. 2012) (mentioning, in dicta, that a petitioner can raise a freestanding innocence claim in a capital case).

Clement misunderstands the purpose of the actual innocence exception in federal habeas review and attempts to utilize it as mechanism to raise a claim of insufficient evidence. The undersigned has previously considered Clement's claim that the evidence presented at trial was insufficient to sustain the convictions and concluded that it lacked merit. As the undersigned has already conceded that Clement's claims may be reviewed on the merits, Clement's claim of actual innocence is not relevant to this petition. Accordingly, the undersigned **FINDS** that this claim should be dismissed.

### 9. Failure to show that Clement was a custodian of the victims

Clement alleges that the Circuit Court erred by not dismissing the 32 counts of Custodial Sexual Abuse as there was insufficient evidence to support the convictions. (ECF No. 20 at 18). Clement contends that Ms. Howell clearly stated that the victims' grandmother, rather than Clement, was the guardian or custodian of the victims. (*Id.*). Clement asserts that not dismissing these counts violated the rule announced in the WVSC decision, *State v. Longerbeam*, 226 W. Va. 535 (2010). (*Id.*). In that case, the WVSC determined that the defendant was not acting as a custodian for the purposes of the statute when he sexually assaulted his niece after he briefly entered her home in order to search for a missing hamster. *Longerbeam*, 226 W. Va. 535 at 536, 540.

The Circuit Court considered this argument at length in Clement's first habeas petition, characterizing it as a claim that there was insufficient evidence to support a conviction under the custodial abuse counts. (ECF No. 24-17 at 101-07). The Circuit Court first distinguished the situation presented in Clement's case, where Clement "abused the victims in his own home, not some home where he just happened to be for an impromptu hamster safari," from that in *Longerbeam*. (*Id.* at 103). The Circuit Court then went on to conclude that the record at trial clearly established Clement's status as a custodian given that he cooked meals for the victims and was relied on to keep the victims safe. (*Id.* at 106).

The WVSC also considered this claim on appeal, noting that whether Clement was properly considered a custodian "was a question of fact for the jury, and not a legal question to be decided by the [Circuit Court]." (ECF No. 24-21 at 7). The WVSC then concluded that the evidence presented at trial was sufficient to sustain a conviction as the jury was presented evidence that:

 (1) petitioner had cohabited for years with the children's grandmother, (2) petitioner had an ongoing relationship with the children, (3) the children were frequently in petitioner's home and in his presence while their grandmother was asleep or occupied elsewhere, (4) the children's father expected petitioner to watch over the children when they were in petitioner's home, (5) the children's mother expected petitioner to keep the children safe while they were with him, and (6) petitioner ensured that the children were fed while they were with him. At the close of evidence, the trial court instructed the jury on the legal definition of "custodian."

(*Id.* at 8). As previously noted, the Custodial Abuse Statute prohibits "any parent, guardian or custodian of or other person in a position of trust in relation to a child under his or her care, custody or control" from engaging in "sexual contact with a child under his or her care, custody or control…" W. Va. Code § 61-8D-5(a). A "custodian" is defined as:

> [A] person over the age of fourteen years who has or shares actual physical possession or care and custody of a child on a full-time or temporary basis, regardless of whether such person has been granted custody of the child by any contract, agreement or legal proceeding. "Custodian" shall also include, but not be limited to, the spouse of a parent, guardian or custodian, or a person cohabiting with a parent, guardian or custodian in the relationship of husband and wife, where such spouse or other person shares actual physical possession or care and custody of a child with the parent, guardian or custodian.

W. Va. Code § 61-8D-1(4). Clement challenges the state courts' determination that sufficient evidence was presented to maintain his convictions under this statute. Clement characterizes this claim as a challenge to the Circuit Court's decision to allow the custodial abuse counts to be submitted to the jury. (ECF No. 20 at 18). However, Clement's characterization misses the mark because, under West Virginia law, whether Clement was a custodian of the victims was a question of fact to be decided by the jury. *See State ex rel. Harris v. Hatcher*, 236 W. Va. 599, 604 (2014) ("Our prior case law reflects that a defendant's status when charged with a violation of West Virginia Code § 61–8D–5 has always been an issue for the jury to determine."); *State v. Timothy* C., 237 W. Va. 435,

450 (2016) ("Importantly, the question of whether a person charged with a crime under West Virginia Code § 61–8D–5 (2010) is a custodian or person in a position of trust in relation to a child is a question of fact for the jury to determine.") (internal quotation and alteration omitted). Accordingly, the undersigned will consider Clement's claim that he was not properly considered a custodian as one alleging that there was insufficient evidence presented to sustain his convictions.

As previously noted, when a defendant challenges the sufficiency of the evidence supporting a conviction, the Government is given "the benefit of all reasonable inferences from the facts proven to those sought to be established." *Tresvant*, 677 F.2d at 1021. Additionally, it is for the jury to resolve  conflicts in testimony and the credibility of witnesses. *Curry*, 461 F.3d  at 457. At trial, witnesses testified that Clement cohabited with the victims' grandmother, and he was treated like a grandfather by the victims who referred to him as "Papa Bear." (ECF No. 24-29 at 202). Clement was viewed "like family" by the victims' mother. (ECF No. 24-30 at 44). The minor victims frequently spent the night at Clement's residence where he would cook for the children, (*Id.* at 57), was entrusted by the victims' mother  to keep them safe, (*Id.* at 64), and was expected to discipline the children within bounds set by the parents. (*Id.* at 65). Clement would go shopping with the victims and their grandmother and frequently bought gifts for one of the victims. (*Id.* at 77). Clement himself testified at trial that "I looked upon these as my family and my grandchildren, and I've tried to provide the best that I could for the family." (*Id.* at 151-52).

Under these circumstances, the jury could rationally have found that Clement was a custodian for the purposes of the statute. The WVSC has upheld convictions under the custodial abuse statute for individuals which have had similar or much more attenuated

custodial relationships to the victims. *See Hatcher,* 236 W. Va. at 605 (school bus driver appropriately found a custodian); *Clarence S. v. Ballard*, No. 14-0356, 2014 WL 6607863, at *28 (W. Va. Nov. 21, 2014) (finding defendant could be considered a custodian where he "resided with the victim's mother, as her paramour, for approximately 12 years," and "[t]he victim trusted the [defendant] and viewed him as a father figure."); *State v. Collins*, 221 W. Va. 229, 234 (2007) (defendant who frequently visited victim's house and took victim on a ride on an all-terrain vehicle could be convicted as a custodian as "persons in temporary physical control of children" can qualify as a custodian); *State v. Timothy C.*, 237 W. Va. at 450 (2016) (neighbor who frequently visited and played with children could qualify as custodian). Similarly, this Court has upheld a conviction under this statute against a defendant who was a teacher's aide, responsible for overseeing a single student, and sexually abused a different student on a school bus. *Blaney v. Ballard*, No. 6:13-CV-08538, 2014 WL 1276502, at *10-13 (S.D.W. Va. Mar. 27, 2014).

Clement argues that he could not have been a custodian of the victims as the victims' mother believed the victims' grandmother to be primarily responsible for supervising the victims. (ECF No. 20 at 18). However, the statutory definition provides that one "who has *or shares* actual physical possession or care and custody of a child" qualifies as a custodian. W. Va. Code § 61-8D-1(4) (emphasis added). Accordingly, even if the victims' mother viewed the grandmother as the primary custodian of the victims, this does not foreclose the jury from finding that Clement shared custodial duties when the victims stayed in his shared residence. As various testimony at trial, including that of Clement himself, revealed that Clement was viewed as a part of the family and a step-grandfather by the victims and their family, cohabited with the victims' grandmother, and cooked, bought gifts for, and disciplined the victims who frequently spent the night at his

residence without their parents, the jury could rationally have found that Clement qualified as a custodian under the statute. Accordingly, the undersigned **FINDS** that the state courts' determination there was sufficient evidence to sustain Clement's convictions under the custodian sexual abuse statute was not objectively unreasonable and was not contrary to federal law.

### 10.  Ineffective assistance of habeas counsel

Clement argues that his constitutional rights were violated by his habeas counsel, Hoosier, whose performance was so defective that Clement was essentially denied "a fair and proper appeal review." (ECF No. 20 at 19-20). Clement faults the WVSC for both "knowingly allowing" Hoosier to "submit a deplorable and atrocious" appellate brief and refusing to consider Clement's *pro se* brief. (*Id.*).

Clement directs his claim of ineffective assistance of habeas counsel at the WVSC for allegedly condoning the ineffective assistance of counsel. (*Id.*). However, this framing of the issue cannot overcome the fundamental barrier that there is no independent federal right to effective assistance of state habeas counsel. The Supreme Court has held that ineffective assistance of habeas counsel regarding a claim of ineffective assistance of *trial* counsel, may provide cause for a procedural default in a federal habeas proceeding. *Martinez v. Ryan,* 566 U.S. 1, 9 (2012). However, the Supreme Court specifically stated that this exception did not affect the general rule that ineffective assistance of habeas counsel does not by itself present a valid federal claim. *Id.* at 16. Therefore, an allegation of ineffective assistance of habeas counsel may only be employed to raise an otherwise procedurally barred claim of ineffective assistance of trial counsel. *See Green v. Ballard*, No. CIV.A. 3:02-1348, 2015 WL 1612198, at *5 (S.D.W. Va. Apr. 10, 2015) ("The Magistrate Judge correctly cited 28 U.S.C. § 2254(i), which provides that 'ineffectiveness

or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.'").

The undersigned has reviewed on the merits all of the claims raised by Clement in his federal habeas proceeding. Clement's claim that Hoosier provided ineffective assistance of habeas counsel does constitute a cognizable independent claim for federal habeas review. The undersigned accordingly **FINDS** that this claim is plainly meritless and is subject to summary judgment.

### 11. Ineffective assistance of habeas counsel

In this claim, Clement reiterates his allegation that Hoosier provided ineffective assistance of habeas counsel, asserting that he filed a "substandard and incomplete Writ of Habeas Corpus." (ECF No. 20 at 21). However, as previously indicated, a claim that habeas counsel provided deficient performance cannot by itself support a claim for federal habeas relief. It may, at most, allow a litigant to raise claims that would otherwise be procedurally barred in federal habeas review. Clement pursued claims *pro se* on his own behalf in his initial habeas proceeding, and the Circuit Court reviewed those claims. (ECF No. 24-17 at 28). To the extent that Clement believes Hoosier failed to raise valid arguments in his initial state habeas proceedings, he was free to present those claims both in his subsequent state habeas petition and in the instant federal § 2254 petition. The undersigned has reviewed on the merits every claim which Clement has raised in this petition, and concluded the state courts did not err in dismissing the claims. Accordingly, the undersigned **FINDS** Clement is not entitled to relief based on this claim as it is not cognizable in federal habeas review.

In summary, the undersigned has considered all of Clement's claims and **FINDS** that they clearly fail to state a claim which entitles him to relief; therefore, Respondent's

request for summary judgment should be granted.

## V.    **Proposal and Recommendations**

The undersigned respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** the following:

1. Petitioner's Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 as Amended, (ECF Nos. 2, 20), be **DENIED**;

2. Respondent's Motion for Summary Judgment, (ECF No. 25), be **GRANTED**;

3. This action be **DISMISSED, with prejudice.**

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, The parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Johnston, and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to Petitioner and counsel of record.

**FILED:** July 7, 2020

Cheryl A. Eifert
United States Magistrate Judge